## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DIANE SWINNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **Case No. 10-2021-CM** |
| **STATE FARM FIRE AND CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DIANE SWINNEY'S RESPONSE TO STATE FARM'S MOTION TO STRIKE SUPPLEMENTAL DESIGNATION AND REPORT OF LARRY VORBA

This Court entered the Pretrial Order on May 11, 2010 allowing discovery of "Plaintiff's bad faith and unfair trade practice claims." and "a. Final Witness and Exhibit Disclosures Under Rule 26(a)(3). The parties' final witness and exhibit disclosures pursuant to Fed. R. Civ. P. 26(a)(3)(A) shall be filed no later than 21 days before trial." [Doc 105, page 27]

Rule 26(a)(3)(A) states:

> **(e) Supplementing Disclosures and Responses.**
> **(1) *In General*.** A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – **must supplement or correct its disclosure or response:**
> **(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect,** and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing;…

New evidence was obtained as State Farm took Insurance Expert Stephen Strzelec's deposition on May 14, 2010. Mr. Madison's deposition was taken on June 23, 2010, and Mr. Strzelec filed a Rule 26 Supplemental Expert Disclosure on July 8, 2010 and Mr. Vorba's Supplemental Report was filed August 11, 2010. [Doc. 201].

Plaintiff followed the Court's orders and the law.  Therefore, Defendant's Motion is without a valid legal or factual basis and should be denied.

The New Mexico Court and legislature have created a strong body of law and statutes protecting insurance policyholders from illegal insurance bad faith conduct by insurers in failing to timely and thoroughly investigate, evaluate and pay claims.

The essence of this case focuses upon State Farm's bad faith and unfair trade practices. These violations have been established by State Farm's employees and former State Farm Auto/Fire Section Manager (homeowner's and auto policies) for the entire State of Alaska, insurance expert Steven Strzelec.

## STATE FARM HOMEOWNER'S INSURANCE CONTRACT

State Farm's Policy Loss Settlement section requires:

> **A1  Replacement Cost Loss Settlement Similar Construction**
> **We will pay the cost to repair or replace with similar construction and for the same use on the premises."** (Exhibit 1)

## STATE FARM'S EMPLOYEE & 30(B)(6) CLAIM WITNESS

Defendant State Farm employee and 30(b)(6) witness, Kent Peterson, was the fire team manager in the Fire Claim Central Environment handling property claims, supervising the claim processor group whose duties as a team manager were to oversee upward of 50 employees and was responsible for supervising coverage evaluation.

22

23     Q.  BY MR. VOGEL:  And -- okay.  So this -- the
24  policies -- the State Farm policies like what Diane
25  Swinney has, they're designed to cover like if you have

23

 1  a tornado?
 2     A.  Correct.
**22  …then do you go in and repair**
**23  all of the tornado damage to that particular house?**
**24     A.  We would go in and write an estimate for the**
**25  repair of that damage.**

2

24

2 …**we may ask for a**
3 **contractor to assist in that preparation.**  Meet a
4 contractor generally is what we would do to try to
5 develop a scope that is agreed upon from a repair
6 process.  But, yeah, we would -- we would -- yes, **we**
7 **would provide an estimate to the policyholder for the**
8 **repair.**

**Mr.** Peterson is aware of the tornado in Columbus, Kansas on June 29/30, 2005:

33

13 For the tornado in -- in and around Columbus, Kansas,
14 and the dates that you guys had given us were like --
15 began, I guess, June 29th and 30th of 2005.
16 A.  Correct.
**17** **Q.  Okay.  You're aware of that tornado?**
**18** **A.  Yes.**

State Farm's 30(b)(6) witness also recognized their duties of good faith and fair dealing.

Mr. Peterson testified:

27

23 …to be an advocate for the
24 policyholder.  **Our job or our role is to find coverage**
**25** **for the policyholder.**

**28**

 **9** **Q.  BY MR. VOGEL:  Have you heard that the duty**
**10** **of good faith and fair dealing is giving the**
**11** **policyholder's interest the same or equal consideration**
**12** **as the insurance company's interest?**
**13** **A.  Yes.**
**14** **Q.  Okay.  And you agree with that?**
**15** **A.  I would agree with that.**  (Exhibit 2)

## FORMER STATE FARM MANAGER'S REBUTTAL AND SUPPLEMENTAL DISCLOSURES ESTABLISH INSURANCE BAD FAITH CONDUCT

Mr. Strzelec's Report states in pertinent part:
4.     **…the obligation for an insurer is to look for coverage and look for ways to**

**pay the claim, not deny it.** …Therefore, the claim representative's chief task is to seek and find

coverage, not to seek and find coverage controversies or to deny or dispute claims."…

3

5.     The responsibility to conduct a timely, objective and adequate investigation falls solely on the claim representative and the insurance company.  The hiring of an outside expert, such as Laurence C. Fehner, is simply an investigative tool and his report and observations are just a part of the investigation. …**All relevant discrepancies in the information collected during the investigation need to be properly resolved, prior to making the coverage determination.**  Simply hiring an outside expert does not absolve the insurer of their responsibilities and good faith obligations to the insured.

7.     The damage to the Swinney residence can be divided into three distinct components; each requiring a timely, objective and adequate investigation and evaluation.  These are the wind damage to the main structure, the wind damage to the detached garage, and the collapse of the kitchen floor area.  **A repair estimate for the main structure, including the collapsed flooring system totaling approximately $155,000 has been provided to State Farm.**  Repair costs totaling approximately $1.129 for the detached garage have also been submitted to State Farm.

8.     …The Fehner report does not address the collapse to the floor system and Mr. Fehner admits to not inspecting under the house where the collapse took place….

9.     **Mr. When Mr. Guebert took the deposition of Mr. Vorba, the engineer, he specifically asked him, "And is it your opinion that collapse of – I'm calling is a collapse of the stone crushing on the stem wall resulted from water coming from the sanitary system?"** Mr. Vorba replied, "Yes".  Mr. Guebert then asked, "Are you willing to swear to it to a reasonable degree of engineering probability?"  To which Mr. Vorba replied, "Yes".

The policy provides additional coverage for collapse as follows:

SECTION I – ADDITIONAL COVERAGES

   11.  **Collapse**.  We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building.  (Exhibit 3)

## <u>DEPOSITION OF STEPHEN STRZELEC</u>

48

1  the claim was
2    denied without conducting an objective and adequate
3    investigation of all the facts.

8  there were neighbors that could have
9    been identified regarding the damage.

56

6     A.  I'm saying they didn't conduct an adequate
7    investigation.  **They didn't consider all the facts in**
**8**    **doing their analysis.  They conducted a one-sided**
**9**    **analysis looking at specific information instead of**
**10**    **looking at the totality of the information.**

57

5  when they take all that
6    information, and they ignore one side of the information
7    or discard it without properly investigating it and
8    reaching their conclusion, then their investigation is
9    not adequate.  They didn't have enough investigation and
10    didn't complete an investigation to answer the questions
11    they needed to before denying the claim.

79

20    A.  **Any time you deny a claim without conducting an**
**21**  **adequate investigation or ignoring facts and then failing**
**22**  **to reconcile it, you're denying the claim on purpose.**  I
23    mean you're not accidentally denying the claim.  You're
24    denying the claim intentionally.  And the fact that they
25    denied the claim without conducting an adequate

81

17    A.  Any time you don't pay a claim that is owed, or
18    you deny a claim without conducting a complete
19    investigation, therefore, not paying a claim that may be
20    owed, you know, you're not paying somebody.  You're
21    holding on to the money.

5

89

**13  do insurance companies**
**14    have a duty of good faith and fair dealing to their**
**15    policyholders?**
**16        A.  Yes, they do.**
17        Q.  Have you heard that that duty includes the duty
18    to give the interests of the policyholders the same or
19    equal consideration as to the insurance company's
20    interests?
21        A.  That's correct, yes.
22        Q.  Do you have an opinion as to whether State Farm
23    violated those duties in this case?

90

1    **I believe that State Farm did violate the**
2    **duties of good faith and fair dealing and held their**
3    **interests above those of the policyholders in this case.**
4        Q.  Did you have an opinion as to whether the
5    coverage under the State Farm policy for the damages and
6    losses sustained by the policyholders in this case [sic]?
8        A.  Yes, I do.
9        Q.  And what is that opinion?
10        A.  I believe that based on my training and
11    experience and education that -- and the totality of the
12    information that I've reviewed in this case -- that this
13    damage was not caused by any exclusion within the policy,
14    and it is covered under the policy.

91

1    Q.  You said earlier in your testimony that they
2    have a duty to continue to investigate and evaluate the
3    facts and information that come in on a claim; is that
4    correct?
5        A.  That's correct.  **As new information is**
6    **received, they're under the obligation to consider that**
7    **new information and review it and re-evaluate the claim**
8    **based on that additional information.**
9        **Q.  Did State Farm do that in this case?**
11        **A.  No, I don't believe so.  I believe that if they**
12    **had, based on the totality of the information, that this**
13    **claim would have been paid.**

92

4        Q.  And did State Farm do that here?
6        A.  No.  **State Farm never conducted an**
7    **investigation regarding the amount of damage.**
8        Q.  Now, what is the significance of a catastrophe
9    code that's assigned by State Farm?

11      A.   When a catastrophe hits an area that's given a
12   specific date of loss and a CAT code is assigned that
13   allows them to gather all the information regarding that
14   catastrophe, all the claims are assigned to that CAT
15   code, and they're able to first of all set reserves based
16   on the totality of the catastrophe as opposed to
17   individually.

92

25   Q.   Are you aware that from these -- around

93

**1   June 30, 2005, the tornadoes or other high wind events in**
**2   Kansas, Missouri, Oklahoma and Texas, that State Farm**
**3   assigned a catastrophe code?**
**5      A.   I'm aware of that, yes.**
**6      Q.   Are you aware that State Farm has admitted in**
**7   discovery that they paid out about $12,398,803 in damages**
**8   involving 2,763 other claims regarding these storms?**
**10     A.   I believe that's correct, yes.**
11     Q.   What, if anything, could State Farm have done
12   when adjusting Swinney's claim when they know about all
13   these other storms in this area and the number of claims
14   and the amount of damages that they paid out?
16     A.   Well, clearly, **that's one more piece of**
**17   information that's available to the claim handler and the**
**18   claims people when looking at this loss.  And seeing the**
**19   large trees that are blown down and the damage to the**
**20   neighboring structures and the other damage,**

99

3    Q.   Do you understand that Ms. Swinney is only
4    requesting that the home be repaired for the damages
5    caused by the June 30th, 2005, high winds and tornado
6    event as well as the collapse of that wall underneath the
7    kitchen and I think maybe in other parts of the house?
8      A.   **I'm aware that there is an estimate to repair**
**9   for about $155,000.**

100

8    Q.   Do you have an opinion what State Farm should
9    have done when they became aware of the information
10   contained in Exhibit O from Mr. Ortwein for the repair of
11   the tornado and wind damage to the home?
13     A.   Well, I would think they would review, and I
17   , in fact, getting an estimate for
18   $155,000 for this work is probably I would think actually
19   to State Farm's benefit.

7

102

18     Q.  Do you have an opinion as to whether State Farm
19    misrepresented the policy provisions relating to the
20    coverage here?
22     A.  They denied it based on the exclusion for
23    settling.  I don't think the exclusion for settling
24    applies in this case…

103

1    I don't think they correctly applied it, and I don't
2    think they correctly looked at the entire policy with the
3    denial, you know.  They didn't consider any additional
4    coverages including collapse as well.

104

7     Q.  Why is it important for an insurance company to
8    try to settle catastrophic claims within, say, a 90-day
9    period of time?

14    claims can cause hardship and hardship on insurance, but
15    CAT claims can be -- I was going to say catastrophic, but
16    that would be really redundant -- CAT claims can impact
17    not only just an individual insured but an entire area
18    and have ramifications much beyond an individual loss. (Exhibit 4)

## **CONCLUSION**

Insurance companies owe fiduciary duties of good faith and fair dealing and statutory requirements which obligated Defendant State Farm to calculate the cost of repair damages for the high wind/tornado and collapse.  Plaintiff shall present this evidence to the jury, the fact finder who shall determine if State Farm acted in bad faith and violated the law in multiple ways, including failing to calculate the repair damages AND ignoring the repair damages provided. The jury shall also calculate the damages caused by Defendant State Farm's illegal conduct.

WHEREFORE, Diane Swinney respectfully requests that the Court deny Defendant's Motion to Strike.

Respectfully submitted,

*/s/  Steven Vogel*_____
STEVEN VOGEL
10400 Academy Road NE - Suite #240
Albuquerque, New Mexico 87111
(505) 293-8888

TERRENCE REVO
ROGER SMITH
Revo Law Firm
10400 Academy NE - #200
Albuquerque, New Mexico 87111
(505) 293-8888
*Attorneys for Plaintiff*

I certify that on the 10th day of September, 2010, I served the following parties by e-mail and I filed the foregoing electronically through the CM/ECF system which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

TERRY GUEBERT
Guebert & Bruckner, P.C.
tguebert@guebertlaw.com
*Attorney for Defendant State Farm*

*/s/  Steven Vogel*_____
STEVEN VOGEL

EXHIBIT
1

Kent Peterson                          November 17, 2008

1    look at a mileage.  It may include pet, capacity of

2    renting or putting them in a --

3         Q.    Kennel.

4         A.    -- kennel for a period of time.

5              But all those additional expenses that you as

6    a policyholder incur due to the loss of being

7    uninhabitable against what you normally would spend

8    from an expenditure standpoint.

9         Q.    Do you have a sense, based on your

10   experience, how long does it usually take if there's,

11   you know, been tornado damage and then it gets

12   repaired, and then before people are finally able to

13   move back into their house?

14        MR. GUEBERT:  Object to the form.  Go ahead.

15        A.    Generally speaking, you know, in a town that

16   it's a traumatic event, you know, such as the

17   Oklahoma City event, the Greensburg event, the

18   resources become limited and the infrastructure of the

19   town in trying to just get back those basic

20   infrastructure needs.  But, you know, 6 to 12 months

21   would be a general timeline that we would be looking

22   at.

23        Q.    BY MR. VOGEL:  And -- okay.  So this -- the

24   policies -- the State Farm po⌐ EXHIBIT ⌐  what Diane

25   Swinney has, they're designe⌐    2    ⌐ .ke if you have

9258e401-5585-46ed-95f5-641610b4b686

Kent Peterson                              November 17, 2008

                                                      Page 23

1    a tornado?

2         A.    Correct.

3         Q.    Or if you have a fire?

4         A.    Correct.

5         Q.    You don't really have many floods, I don't

6    think in Kansas, do you, or this area?

7         A.    Not many.  Primarily that would be in the

8    Kansas City area, Southeast Kansas, Wichita.  Those are

9    the primary areas that you do experience some of those

10   events.

11        Q.    Okay.  So if you get wind damage to the house

12   and it damages like the roof and the walls and stuff,

13   then State Farm would just pay to replace that or

14   repair that type of damage, that type of tornado

15   damage?

16        MR. GUEBERT:  Object to the form.  Go ahead.

17        A.    We would do an investigation and make a

18   determination that -- specifically that the wind event

19   caused the damage to those areas and that that was a

20   related event to the occurrence.

21        Q.    BY MR. VOGEL:  Okay.  And if you determined

22   it was a related event, then do you go in and repair

23   all of the tornado damage to that particular house?

24        A.    We would go in and write an estimate for the

25   repair of that damage.  If the capacity of that was

Kent Peterson                           November 17, 2008

1    beyond what we could either see from a -- you know,

2    from a visual standpoint, then we may ask for a

3    contractor to assist in that preparation.  Meet a

4    contractor generally is what we would do to try to

5    develop a scope that is agreed upon from a repair

6    process.  But, yeah, we would -- we would -- yes, we

7    would provide an estimate to the policyholder for the

8    repair.

9         Q.   How do you do that in the real world?  What

10   steps does State Farm take?

11        A.   In the real world, we use an estimatics

12   platform called Exactimate.  That's a -- it's an

13   outside vendor.  Most contractors today use Exactimate.

14   They geographically go in and look at prices within the

15   market.  That includes the material and the labor

16   components.  We use Exactimate in a way that develops a

17   replacement cost estimate based on the scope of

18   damages.

19             We generally send out our trained folks,

20   mainly like a mobile worker would be who would be out

21   on site.  They go and they do a detailed scope.  We

22   have kind of a standard procedure.  We develop the

23   facts, try to learn what the damages are, and go

24   through and look at all those damages, both from the

25   interior and exterior standpoint, assuming that a

Kent Peterson                          November 17, 2008

1   believe is going to happen.  And there's experiences

2   that go in historically within the first few hours.  If

3   you see 2 or 300 hail claims reported, you can assume

4   that that's going to triple, quadruple by the end of

5   the day.  So it's pretty fair to say that you're going

6   to get to that 500 number.

7        Q.   Do you know who was -- well, let me start

8   off.  You say queue.  Is that q-u-e?

9        A.   Q-u-e, yes.

10        Q.   And that's like in the computer, right?

11        A.   Correct.

12        Q.   And you just -- well, let's use the one here.

13   For the tornado in -- in and around Columbus, Kansas,

14   and the dates that you guys had given us were like --

15   began, I guess, June 29th and 30th of 2005.

16        A.   Correct.

17        Q.   Okay.  You're aware of that tornado?

18        A.   Yes.

19        Q.   Okay.  First, do you know who assigned the

20   catastrophe code on that particular tornado event?

21        A.   I do not.

22        Q.   Okay.  Secondly, can you tell us how large

23   was this tornado?  I mean, do you know where it started

24   for example?  What states and which way it moved?

25        A.   I would have to review some information to go

Kent Peterson                          November 17, 2008

1    issues from the State Farm Fire and Casualty Company?

2         A.    That's correct.   Property and casualty.

3         Q.    Or property and casualty, okay.

4              So you're the person most knowledgeable about

5    handling these tornado-like claims like Swinney has?

6         A.    Correct.

7         Q.    Okay.  All right.  Let me switch.  I'm just

8    want to go through.  What's your understanding of what

9    the duties of good faith and fair dealing to your

10   policyholders are for State Farm?

11        MR. GUEBERT:   Object to the form.  Go ahead.

12        Q.    BY MR. VOGEL:  Go ahead.

13        A.    My understanding of those duties consist with

14   consistency of communication with our policyholders,

15   accurate assessment of the policy and forwarding the

16   benefits of the policy, explaining all those benefits

17   to our policyholder, being timely with our

18   communication to them, both verbally and in written

19   form.  Being prompt in terms of our status of the claim

20   as its ongoing.  Making fair evaluation to listen to

21   all of the facts.

22              And I'll maybe go off the page a little bit

23   here, but beyond that, to be an advocate for the

24   policyholder.  Our job or our role is to find coverage

25   for the policyholder.  Our job is to interpret the

1    contract.  And to do that fairly, based on the

2    standards set forth by those particular states to deal

3    with them in a good faith manner, and to explain our

4    position and do that in a prompt and timely manner and

5    keep them apprized of all of the information that's

6    ongoing in that evaluation and investigation, and also

7    to consider any information that they may present to

8    us, and evaluate that fairly and promptly.

9         Q.   BY MR. VOGEL:  Have you heard that the duty

10   of good faith and fair dealing is giving the

11   policyholder's interest the same or equal consideration

12   as the insurance company's interest?

13        A.   Yes.

14        Q.   Okay.  And you agree with that?

15        A.   I would agree with that.

16        Q.   I think you said some of these terms, but I

17   just wanted to double check with you.

18             So you agree the insurance company has a duty

19   to thoroughly investigate a claim?

20        A.   Yes.

21        Q.   And they have a duty to timely investigate

22   and evaluate claims?

23        A.   Yes.  That's correct.

24        Q.   Okay.  Do you agree the insurance company

25   should timely pay a claim?

## Supplemental Expert Report of Stephen L. Strzelec

This report is intended to supplement my expert opinion on defendant, State Farm Fire and Casualty's handling of the claim to the Swinney residence.

1.    An overview of my background and qualifications has been previously incorporated in my Preliminary Disclosure. All other opinions have been disclosed in my preliminary report and during my deposition

2.    In preparing this supplemental report, in addition to reviewing the information listed in my Preliminary Disclosure and disclosed during my deposition, I reviewed the following materials: the expert report of William C. Madison

3.    These opinions are based on my experience and training in the insurance industry, my knowledge of statutory and regulatory standards applicable to property and casualty claim handling, my review and knowledge of claim files, claim handling requirements, the many documents I have reviewed in this and other cases, and my review and knowledge of texts, literature, and articles discussing claim handling. I am qualified by training and experience to provide the additional opinions I am expressing herein.

4.    As stated in my preliminary report, the obligation for an insurer is to look for coverage and look for ways to pay the claim, not deny it. This



EXHIBIT
3

Swinney Suppl.   1

is addressed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p13) where it states, "The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims." This includes the obligation to pay all amounts not in dispute.

5.      The responsibility to conduct a timely, objective and adequate investigation falls solely on the claim representative and the insurance company.  The hiring of an outside expert, such as Laurence C. Fehner, is simply an investigative tool and his report and observations are just a part of the investigation.  It is the responsibility and obligation of the insurance company to review the information supplied by the expert in conjunction with all the other investigative material collected to properly evaluate the claim and reach the proper coverage determination.  All relevant discrepancies in the information collected during the investigation need to be properly resolved, prior to making the coverage determination.  Simply hiring an outside expert does not absolve the insurer of their responsibilities and good faith obligations to the insured.

6.      Mr. Madison also relies on the report of Meteorologist Donald W. Burgess in support of his opinions and those of Mr. Fehner.  While this would

be appropriate if State Farm had hired Mr. Burgess during the investigation of the Swinney claim, that is not the case. Mr. Burgess was hired after the claim was denied and only hired after the insured brought suit against State Farm. The expense of hiring this expert was not incurred to help the insured obtain what was owed under the policy or the help State Farm in their investigation, but rather as a defense tactic. State Farm ignored the fact that they had assigned a catastrophe code (CAT) to these storms and paid millions of dollars for thousands of claims.

7.    The damage to the Swinney residence can be divided into three distinct components; each requiring a timely, objective and adequate investigation and evaluation. These are the wind damage to the main structure, the wind damage to the detached garage, and the collapse of the kitchen floor area. A repair estimate for the main structure, including the collapsed flooring system totaling approximately $155,000 has been provided to State Farm. Repair costs totaling approximately $1.129 for the detached garage have also been submitted to State Farm.

8.    The report by Fehner provides some limited observations on the garage structure. The report questions the original construction of the garage but fails to address the damages to the garage or explain how the original construction caused the garage to suddenly shift as so the doors would not open.

The Fehner report does not address the collapse to the floor system and Mr.

Fehner admits to not inspecting under the house where the collapse took place.

The additional coverage for "Collapse" is discussed in my deposition.

9.    Mr. When Mr. Guebert took the deposition of Mr. Vorba, the

engineer, he specifically asked him, "And is it your opinion that collapse of –

I'm calling is a collapse of the stone crushing on the stem wall resulted from

water coming from the sanitary system?" Mr. Vorba replied, "Yes".  Mr.

Guebert then asked, "Are you willing to swear to it to a reasonable degree of

engineering probability?"  To which Mr. Vorba replied, "Yes".

10.    The policy provides additional coverage for collapse as follows:

SECTION I – ADDITIONAL COVERAGES

11. **Collapse.**  We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building.

Collapse means the actually falling down or fallen into pieces.  It does not include  settling, cracking, shrinking, bulging, expansion, sagging, or bowing.

The collapse must be directly and immediately caused by one or more of the following:

a. perils described in **SECTION I - LOSSES INSURED, COVERAGE B- PERSONAL PROPERTY**.  These perils apply to covered building and personal property for loss insured by this Additional Coverage;

b. hidden decay of a supporting or weight-bearing structural member of the building

Two of the perils referred to in a. are 2. **Windstorm or hail,** and 12. **Sudden**

**and Accidental discharge or overflow** of water.  They read as follows:

2. **Windstorm or hail**. This peril does not include loss to property contained in a building caused by rain, snow, sleet, sand, or dust. This limitation does not apply when the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening

12. **Sudden and accidental discharge or overflow** of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance

There is no indication in the documents provided by State Farm that this additional coverage is disclosed to the insured or investigated to determine if it applies to the insured's loss. This is in direct conflict with industry and State Farm standards. In its First Party Seminar, State Farm states, in part, "An insurer should conduct a thorough and comprehensive investigation of claims in order to determine all possible bases for payment of policy benefits."

11.     The opinions stated in this supplemental report are based on the information provided to date and are subject to revision or modification based upon any additional documents or materials I may review or information I may receive on this matter subsequent to this report.

Dated this July 8, 2010 at Sammamish, Washington.

Stephen L. Strzelec

Swinney Suppl.   5

Stephen L. Strzelec                          May 14, 2010

Page 48

1      A.    Yeah, I believe it is; that the claim was
2   denied without conducting an objective and adequate
3   investigation of all the facts.
4      Q.    Okay.  Now, let's talk about what was
5   inadequate about the investigation.
6            What was it that you believe was inadequate
7   about the investigation?
8      A.    Again, there were neighbors that could have
9   been identified regarding the damage.
10     Q.    So interview neighbors?
11     A.    Interviewing neighbors.
12           I believe the home had been inspected just
13  prior to the loss by multiple parties.  A State Farm
14  representative inspected it, and a home inspector
15  inspected it, and it was never researched as to -- I mean
16  if the home had been purchased a year before the loss,
17  that would be a pretty ordinary question to ask.
18  Again --
19     Q.    Can I stop you for just a minute?
20     A.    Um-hmm.
21     Q.    So in addition to interviewing the neighbors,
22  interview the prior inspectors?
23     A.    The prior owner or, yes, the prior owner would
24  be another one and anybody who inspected the home prior
25  to the loss.

EXHIBIT
4

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

533a7baf-356d-4ac3-90a0-f3026a0b0f42

Stephen L. Strzelec                          May 14, 2010

1    Q.   I'm trying to figure out what kind of expert

2    opinion you're going to give.  You know, what you're

3    telling me is that they made the wrong decision, but the

4    jury makes that decision.  That's a factual determination

5    for the jury.

6    A.   I'm saying they didn't conduct an adequate

7    investigation.  They didn't consider all the facts in

8    doing their analysis.  They conducted a one-sided

9    analysis looking at specific information instead of

10   looking at the totality of the information.

11   Q.   Based on what do you say that; based on the

12   conclusion they reached?

13   A.   Based on the conclusion they reached when you

14   look at the information --

15   Q.   Isn't it possible they just weighed the

16   information differently than you do?

17            MR. VOGEL:  Object to the form of the

18   question.

19   A.   No, because I don't see that analysis there.  I

20   don't see where they considered a lot of the information

21   that leans towards coverage for this thing.

22   Q.   Well, if they have two reports -- they've got

23   the report from Norton and Schmidt, and they got the

24   report from Cyntergy.  Then they have their reports from

25   their field representative.  They have the information

Stephen L. Strzelec                              May 14, 2010

1      from Mr. Black.  They've got photographs.

2                And if they look at all of that stuff, and they

3      weigh it, and they reach an opinion different than yours,

4      then they've done it wrong is what you're saying?

5           A.   No.  I'm saying that when they take all that

6      information, and they ignore one side of the information

7      or discard it without properly investigating it and

8      reaching their conclusion, then their investigation is

9      not adequate.  They didn't have enough investigation and

10     didn't complete an investigation to answer the questions

11     they needed to before denying the claim.

12          Q.   All right.  Now I understand that part because

13     that's in your report.  You gave the opinion it's an

14     inadequate investigation, and you gave me four factors on

15     what they should do in order to have made it an adequate

16     investigation, so I understand that.

17               You want to add any more factors to what we've

18     got here?  We've got the four that you've given.  Are

19     there any others?

20          A.   I think we hit the major ones on the

21     investigation.

22          Q.   All right.  So I already understand all that.

23     So they didn't do an adequate investigation, and this is

24     why.

25          A.   That, and upon receipt of the engineer's report

Stephen L. Strzelec                    May 14, 2010

1      A.   You know, yeah, but never that I know of

2   intentionally.  Other than we had a problem with a

3   utilization review company, I believe it was CMR, and we

4   found out after using CMR and denying a significant

5   number and reducing a significant number of claims that,

6   in fact, the reports weren't written by doctors.  They

7   were written by scribes.

8           I'm sure you remember that whole blow-up.

9           State Farm, to its credit, went and identified

10  everybody who'd had benefits reduced or denied because of

11  a CMR report, and they went through, and they reimbursed

12  everybody with interest for the bad reports they got from

13  that vendor.

14          So did we treat somebody unfairly?  We probably

15  treated some of those people unfairly.  Some of them we

16  probably made the right call, but who knows, but State

17  Farm did go out of its way to correct it at that point.

18     Q.   How about in this case; do you see anybody

19  doing anything intentionally wrongful to Ms. Swinney?

20     A.   Any time you deny a claim without conducting an

21  adequate investigation or ignoring facts and then failing

22  to reconcile it, you're denying the claim on purpose.  I

23  mean you're not accidentally denying the claim.  You're

24  denying the claim intentionally.  And the fact that they

25  denied the claim without conducting an adequate

Stephen L. Strzelec                          May 14, 2010

Page 81

1      Q.   Is that what you did whenever you denied a
2   claim?
3      A.   If, in fact, I denied a claim where I didn't go
4   through the added costs of conducting a complete and
5   adequate investigation, I guess that's what I did.
6   Hopefully, you know -- I don't know.
7           I've settled some claims that we handled where
8   it's clear that we didn't conduct a good investigation,
9   and a decision was made prematurely, and that may have
10  happened.
11          Yeah, I don't think, I can't recall any time
12  when anybody I know has ever gone out with that intent,
13  but that's been the result.
14     Q.   So why do you reach the opinion that their
15  financial, how were their financial interests benefitted
16  by the denial of this claim?
17     A.   Any time you don't pay a claim that is owed, or
18  you deny a claim without conducting a complete
19  investigation, therefore, not paying a claim that may be
20  owed, you know, you're not paying somebody.  You're
21  holding on to the money.
22          You know, any time there is a delay in claim
23  handling, it's to the financial detriment of the insured
24  and to the financial benefit of an insurer.  Any time
25  there is a wrongful denial, there is a financial benefit

Stephen L. Strzelec                              May 14, 2010

Page 89

1    opinion regarding the collapse?
2              MR. GUEBERT:   Object to the form.
3         A.   Yes.   Yes, it does, when collapse is mentioned.
4         Q.   Did you review the depositions of the engineers
5    in this case like Mr. Peterson from State Farm and Dean
6    Black and all the depositions?
7         A.   I did read all the depositions, yes.
8         Q.   Did the depositions and their attachments along
9    with all the other materials you reviewed plus your
10   background, education and training provide the basis for
11   your opinions in this case?
12        A.   That's correct.   Yes.
13        Q.   Have you heard that -- do insurance companies
14   have a duty of good faith and fair dealing to their
15   policyholders?
16        A.   Yes, they do.
17        Q.   Have you heard that that duty includes the duty
18   to give the interests of the policyholders the same or
19   equal consideration as to the insurance company's
20   interests?
21        A.   That's correct, yes.
22        Q.   Do you have an opinion as to whether State Farm
23   violated those duties in this case?
24             MR. GUEBERT:   Object to the form.
25        A.   Yes.   I believe I've already stated during my

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

533a7baf-356d-4ac3-90a0-f3026a0b0f42

Stephen L. Strzelec                                    May 14, 2010

Page 90

1    deposition that I believe that State Farm did violate the

2    duties of good faith and fair dealing and held their

3    interests above those of the policyholders in this case.

4         Q.   Did you have an opinion as to whether the

5    coverage under the State Farm policy for the damages and

6    losses sustained by the policyholders in this case [sic]?

7              MR. GUEBERT:  Object to the form.

8         A.   Yes, I do.

9         Q.   And what is that opinion?

10        A.   I believe that based on my training and

11   experience and education that -- and the totality of the

12   information that I've reviewed in this case -- that this

13   damage was not caused by any exclusion within the policy,

14   and it is covered under the policy.

15        Q.   When you were talking about inadequate

16   investigations, when an insurance company does an

17   investigation, are they supposed to thoroughly

18   investigate, get all the information and the facts and

19   then evaluate that information to determine whether there

20   was coverage and the amount of damages?

21        A.   Yes.  An investigation should be thorough and

22   objective gathering all the available facts until a

23   complete picture has been painted and then take the

24   totality of the information and evaluate the claim based

25   on the totality of the information gathered.

Stephen L. Strzelec                              May 14, 2010

1      Q.   You said earlier in your testimony that they

2    have a duty to continue to investigate and evaluate the

3    facts and information that come in on a claim; is that

4    correct?

5      A.   That's correct.  As new information is

6    received, they're under the obligation to consider that

7    new information and review it and re-evaluate the claim

8    based on that additional information.

9      Q.   Did State Farm do that in this case?

10               MR. GUEBERT:  Object to the form.

11     A.   No, I don't believe so.  I believe that if they

12   had, based on the totality of the information, that this

13   claim would have been paid.

14     Q.   What's an all-risk policy?

15     A.   There are basically three types of policies.

16   An all-risk policy, the common name for it, is an

17   accidental direct physical loss policy.  That means it

18   provides coverage for the insured for the insured risk on

19   an accidental direct physical loss basis; that is that if

20   there is damage, it's covered unless it's specifically

21   excluded under the policy.

22     Q.   Is that the type of policy Ms. Swinney had?

23     A.   Yes, it is.

24     Q.   Is it the responsibility of the insurance

25   company to determine the amount of damages?

Stephen L. Strzelec                          May 14, 2010

1            MR. GUEBERT:  Object to the form.
2       A.    That's correct.  That's part of the claims
3    investigation.
4       Q.    And did State Farm do that here?
5            MR. GUEBERT:  Object to the form.
6       A.    No.  State Farm never conducted an
7    investigation regarding the amount of damage.
8       Q.    Now, what is the significance of a catastrophe
9    code that's assigned by State Farm?
10           MR. GUEBERT:  Object to the form.
11      A.    When a catastrophe hits an area that's given a
12   specific date of loss and a CAT code is assigned that
13   allows them to gather all the information regarding that
14   catastrophe, all the claims are assigned to that CAT
15   code, and they're able to first of all set reserves based
16   on the totality of the catastrophe as opposed to
17   individually.  It allows them to keep track of the amount
18   of damages paid off as attributable to the CAT.
19           It used to be that there was some ramifications
20   for catastrophes regarding the agent's profit and loss
21   statement, and I'm not exactly sure what goes on right
22   now, but there is a lot of different things they can do
23   by keeping track of the total amount for a specific
24   catastrophe.
25      Q.    Are you aware that from these -- around

Stephen L. Strzelec                    May 14, 2010

Page 93

1      June 30, 2005, the tornadoes or other high wind events in

2      Kansas, Missouri, Oklahoma and Texas, that State Farm

3      assigned a catastrophe code?

4                  MR. GUEBERT:  Object to the form.

5          A.   I'm aware of that, yes.

6          Q.   Are you aware that State Farm has admitted in

7      discovery that they paid out about $12,398,803 in damages

8      involving 2,763 other claims regarding these storms?

9                  MR. GUEBERT:  Object to the form.

10         A.   I believe that's correct, yes.

11         Q.   What, if anything, could State Farm have done

12     when adjusting Swinney's claim when they know about all

13     these other storms in this area and the number of claims

14     and the amount of damages that they paid out?

15                 MR. GUEBERT:  Object to the form.

16         A.   Well, clearly, that's one more piece of

17     information that's available to the claim handler and the

18     claims people when looking at this loss.  And seeing the

19     large trees that are blown down and the damage to the

20     neighboring structures and the other damage, I think it's

21     clear they are aware that there was a significant wind

22     event, and it's clear that there was significant damage

23     in the local area of the insured's loss, which would lend

24     them to believe that perhaps, or to look, to focus their

25     investigation to look to see if, in fact, the damage here

Stephen L. Strzelec                           May 14, 2010

1          If they are uncertain, then a meteorologist

2     would probably be appropriate.

3          Q.   Do you understand that Ms. Swinney is only

4     requesting that the home be repaired for the damages

5     caused by the June 30th, 2005, high winds and tornado

6     event as well as the collapse of that wall underneath the

7     kitchen and I think maybe in other parts of the house?

8          A.   I'm aware that there is an estimate to repair

9     for about $155,000.

10              MR. VOGEL:  As a matter of fact -- may I

11    have your stamp?

12                        (Exhibit 0 marked for

13                         identification.)

14         Q.   Let me show you what I've marked as Exhibit 0

15    and ask you if you've seen that before.

16         A.   Yes, I have.  It's the estimate or the bid to

17    make the repairs to the Swinney home.

18         Q.   And if I may, if you look on Page 3, it shows

19    structural repairs for about 69,000 and change and floor

20    leveling, 86,000 and change; do you see that?

21         A.   Yes, I do.

22         Q.   When an insurance company gets the additional

23    information such as this Exhibit O from, it looks like

24    the Ross group -- I believe Steve Ortwein prepared it --

25    what's their obligation regarding that new information?

Stephen L. Strzelec                              May 14, 2010

Page 100

1                    MR. GUEBERT:  Object to the form.

2          A.   Well, I've already talked about it before.  Any

3     time new information is made available to the insurance

4     company, they need to add it to their investigation,

5     evaluate that information and make the decision as to

6     whether or not that information impacts their claims

7     decision or their claims handling.

8          Q.   Do you have an opinion what State Farm should

9     have done when they became aware of the information

10    contained in Exhibit O from Mr. Ortwein for the repair of

11    the tornado and wind damage to the home?

12                   MR. GUEBERT:  Object to the form.

13         A.   Well, I would think they would review, and I

14    believe prior to this, it was the original contractor's

15    opinion that the building had to be demolished and

16    rebuilt, but then it was going to be a very expensive

17    proposition.  So, in fact, getting an estimate for

18    $155,000 for this work is probably I would think actually

19    to State Farm's benefit.

20         Q.   Do you have an opinion as to whether State Farm

21    violated its standard to the industry and its duties by

22    failing to contact Ms. Swinney and/or the Triple ABC

23    contractor regarding the repair damage to the garage --

24                   MR. GUEBERT:  Object to the form.

25         Q.   -- before they denied it?

Stephen L. Strzelec                                    May 14, 2010

Page 102

1    assumptions made in that conclusion.  That's why I

2    question the report, and I think any experienced adjustor

3    or claims persons would question that report and have

4    questions.

5              That was kind of redundant, wasn't it?

6         Q.    Do you think that State Farm misrepresented any

7    of the facts of their investigation to Ms. Swinney when

8    they denied the claim?

9              MR. GUEBERT:  Object to the form.

10        A.    In denying the claim I think that they took a

11   very narrow focus -- same as the engineer did -- and

12   elected to ignore an awful lot of the information.  And

13   so in denying the claims, the representations they made

14   to the insured in the denial was based solely on a real

15   narrow perspective instead of all the information that

16   was available in spite of the fact it wasn't a complete

17   investigation.

18        Q.    Do you have an opinion as to whether State Farm

19   misrepresented the policy provisions relating to the

20   coverage here?

21             MR. GUEBERT:  Object to the form.

22        A.    They denied it based on the exclusion for

23   settling.  I don't think the exclusion for settling

24   applies in this case, so I don't think the denial was

25   appropriate in that they correctly quoted the language.

Stephen L. Strzelec                          May 14, 2010

Page 103

1    I don't think they correctly applied it, and I don't

2    think they correctly looked at the entire policy with the

3    denial, you know.  They didn't consider any additional

4    coverages including collapse as well.

5        Q.   Do insurance companies like State Farm adopt

6    some kind of claims manuals or standards for claims

7    adjusting?

8        A.   I have reviewed claim manuals for, I don't

9    know, well over a dozen companies.  I couldn't name all

10   the companies I've reviewed their claim manuals, but

11   every company I've ever been involved with has got claim

12   manuals and policies and procedure for the handling of

13   claims, yes, and State Farm does as well.

14       Q.   Is State Farm supposed to follow their own

15   claim guidelines or claim manuals?

16       A.   Yes.  The standard is to adopt and implement

17   those standards.  The implementation is to follow and

18   force those claim handling standards.

19       Q.   Do you have an opinion as to whether did State

20   Farm adopt and implement their claims manuals or

21   standards in this case?

22            MR. GUEBERT:  Object to the form.

23       A.   I believe State Farm has adopted some

24   outstanding claim manuals and policies and procedures.  I

25   don't think that in this case they were either properly

Stephen L. Strzelec                          May 14, 2010

Page 104

1    implemented or they weren't correctly followed; one or

2    the other.

3           Q.    Based upon what you've testified to before and

4    all the other information?

5           A.    Yes.   Based on my prior testimony and all the

6    information I've reviewed.

7           Q.    Why is it important for an insurance company to

8    try to settle catastrophic claims within, say, a 90-day

9    period of time?

10          A.    That's a good question.   Several states

11   actually have regulations that require CAT claims to be

12   contacted and settled within a specific period of time.

13   CAT claims especially just because they -- well, all

14   claims can cause hardship and hardship on insurance, but

15   CAT claims can be -- I was going to say catastrophic, but

16   that would be really redundant -- CAT claims can impact

17   not only just an individual insured but an entire area

18   and have ramifications much beyond an individual loss.

19          Q.    Did State Farm settle Swinney's claims within

20   90 days?

21          A.    No, they did not.   90 days had expired from the

22   time it was reported until I believe it was probably

23   about 90 days by the time they got back the engineer's

24   report.

25          Q.    Do you have an opinion as to whether State Farm