## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DIANE SWINNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **Case No. 10-2021-CM** |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 205]

**COMES NOW** the Plaintiff, Diane Swinney, (*hereinafter* "Swinney"), by and through her attorneys, Steven Vogel, The Revo Law Firm and Fulcher & Brooks, LLC, and provides her legal memorandum in support of her Response to Defendant State Farm Fire and Casualty Company's ("State Farm") Motion for Partial Summary Judgment ("MPSJ") [Doc. 205]:

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Dean Black (Swinney's son) was living in the home when the high winds/tornadoes struck June 30, 2005 and thereafter when part of the home collapsed in about February 2006.  The home is a solid home constructed in the 1880s of multi-wythe stone masonry and the foundation walls extend down into bedrock.  Mr. Black's sworn testimony identifies major areas of concern and damage to the home and garage, including but not limited to:

a.   June 30, 2005 – The home was damaged by high winds/tornadoes causing interior cracks that increased in width and length monitored since July 2005;

b.   In the attic space roof framing had cracked rafters, broken members, gaps and separations in wooden beams and the attic plywood deck was broken;

c.   The top of the garage, the North wall moved Northward, the garage doors stopped closing correctly after the tornado and the East and West walls bowed outward.

d.   Significant damage to trees and other objects in and around the property, including a 65 year old tree with a 5 foot trunk toppled during the storm;

e.   There were destroyed buildings 65 paces to the Southwest hit by the storm.

f.   February 2006 there was collapse of part of the house when there was rumbling, vibration/shaking under foot as the floor moved, there were more cracks and loss of tile grout in the laundry/bath area which developed about March 2006.

g.   February 2006 the kitchen cabinets were leaning inward and pulling away from the walls.  (Exhibit 1 & AA)

2.      State Farm assigned a catastrophe code (Cat Code) to the series of storms about June 30, 2005 and paid 2763 claims in the amount of $12,398,803 which should have been considered in adjusting this claim.  [Doc. 208, Exhibit A-E, and Exhibit 2]

3.      <u>August 6, 2004 & January 16, 2009</u> – David Bush, a FEMA disaster housing inspector and a licensed professional home inspector inspected the Swinney home BEFORE and AFTER the June 30, 2005 tornado, testified as to the severe tornado/wind damage to the home and identified the damage photographs

                                        3
22      Q.  Can you please tell us your name, sir?
23      A.  Dave -- David Bush.
                                       19
13      Q.  Do you hold any other certifications?
14      A.  **Certified as a disaster housing inspector**
**15   with FEMA housing program.**
16      Q.  Okay.  And what do you do as a certified

17   disaster inspector?
18       A.   Typically **go in after tornado, hurricane,**
19   **floods, and look for the amount of damage that**
20   **need -- that there is to a home, see what needs**
21   **repaired for -- under the FEMA program.**

                                    17
17       Q.   Okay.  When you inspected the home in
18   August 6th of 2004, from your report it appears that
19   the house is in good shape?
20       A.   Yes, sir.

                                    18
17       Q.   And **do these photographs that you've**
18   **reviewed, do these show the damage that you saw two**
19   **weeks ago?**
20       **A.   Yes, sir.**
21       **Q.   Okay.   When you went through the home back**
22   **in August 6th, 2004, was this damage present that's**
23   **shown in these photographs?**
24       **A.   No, sir.**

                                    43
13       Q.   **And about four and a half years later on**
14   **January 16th of 2009 when you went to the Swinney**
15   **home, did you see any signs of tornado or wind damage**
16   **to the Swinney residence?**

                                    43
20       **A.   Yes, sir.   There's some cracking and things**
21   **that would be an offset that would be typical.**  [Doc. 117 –
Exhibit C]

4.       Dr. David Mitchell, a forensic meteorologist, researched the June 30, 2005 storms

and provided a report which was within meteorological probability which stated in part:

> **The NWS official reports and weather records clearly show that the**
> **June 30, 2005 storm event which occurred across extreme southeastern**
> **Kansas (including Cherokee County and the city of Columbus, Kansas)**
> **produced high wind gusts, mesocyclones and tornadoes. The radar**
> **images obtained from the NCDC clearly show the intensity and extent**
> **of the synoptic (large scale) storm system during the June 30, 2005**
> **storm event. "Based on the review of the official NWS reports, surface**
> **weather observations and NEXRAD Doppler Radar covering the time**
> **period of the storm event of June 30, 2005 in extreme southeastern**
> **Kansas and Cherokee County, it is my opinion that the *Property* was**
> **impacted by both tornadic and supercell straight line winds.**  [Doc. 117-
> Exhibit B]

Dr. Mitchell's deposition excerpts:

66

11     Q.   And actually, the last portion, the last
12   sentence, you say based on all your review, **it's your**
13   **opinion that the property was impacted by both tornadic**
14   **and supercell straight-line winds.**
15     **A.  Correct.**

81

20     **Q.  In this particular storm, what would be the**
21   **highest level of tornadic winds in this type of storm?**
23     A.   Well, the cyclonic winds -- this is a
24   **supercell storm,**

82

7   **Winds in these types of storms**
8   **in the Midwest can reach 180 miles an hour.**  Here we
9   have no wind measurements, but we have a similar-type
10   storm.  So we have a very dangerous supercell storm
11   capable of spawning tornados at any moment, and also
12   producing very strong cyclonic and straight-line winds.
13     Q.   (BY MR. VOGEL)  **And what would be, based on**
14   **your experience with this type of supercell storm, the**
15   **upper end of the straight-line winds?**
16     **A.  Well, again, the straight-line winds could be**
17   **also as high as 150 to 160 miles an hour.  Those have**
18   **been clocked, also.**  It just depends upon the storm and
19   the conditions of the storm.  What I see from radar,
20   with the intensity of the radar, we could certainly have
21   wind speeds approaching that value.  [Doc. 117- Exhibit B]

5.     Larry Vorba, PE, PMP, the Director of Structural Engineering for Cyntergy, ACE (Architecture-Engineering-Construction) and a **Certified High Winds Inspector**, INSPECTED the severely damaged home May 10, 2006, June 3, 2006, June 17, 2008 and January 16, 2009 in Columbus, Kansas, was deposed and prepared reports which were provided to State Farm.  The Reports enumerated the following:

**Observations**

➢ **The exterior west wall appears to have moved outward.**

➢ Cracks in the plaster walls and signs of movement were observed in multiple areas of the house.

4

> The kitchen floor appears to have shifted.
> The kitchen cabinets have pulled away from the kitchen wall.
> **The roof framing observed in the attic showed signs of recent movement.**
> **Evidence of roof framing movement was also seen in the adjacent unattached garage structure south and west of the Swinney residence.**

## Analysis

> **The effects of the storm event on June 30, 2005 at or near the Swinney residence appear to coincide with the damage effects of a moderate tornado.**

## Conclusions

> **Irrefutable evidence of strong winds causing significant damage immediately adjacent to and all around the Swinney residence, indicates that the residence was exposed to high winds and possibly tornadic activity during the storm of June 30, 2005.**
> The shifts to roof rafter support purlins and separation of the struts from the purlins are **consistent with reverse stresses created by wind uplifts on the roof.**
> It is unlikely that the wind uplifts were uniform over the roof especially if a tornadic vortex was present.  The resulting unbalanced loads would contribute to the observed shifts and separations and could have overloaded the supporting ceiling joists found cracked.
> The resulting shifts of load support for the roof framing could cause increased thrusts on the perimeter support walls – thus the pullout of outriggers and west wall movement observed.

Larry Vorba, PE, PMP, provides a Summary of the Structural Engineering Investigation after a follow-up examination of the severely damaged home on June 17, 2008.  The Summary states in pertinent part:

## Observations

> From the noticeable distortions in the kitchen floor, kitchen cabinets, the upstairs hallway cabinetry and large bedroom ceiling it became apparent that something had changed the flow of stresses within the structural system of this residence.
> Since the residence was in the path of a June 30, 2005 tornado, the potential for overloads

and uplifts on the roof framing is great.  There are numerous conditions noted from our site visits that are indicative of the roof attempting to lift and/or shift off of its current support system and not quite coming back to the same position.  Conditions noting roof framing movement are as follows:

    **a.**   **Roof rafter support purlins have moved in relation to the rafters;**

    b.   Struts are separated from the support purlins;

    c.   Outriggers are pulling loose from anchor rafters;

    **d.**   **Several rafters and ceiling joists were found cracked;**

    e.   A section of the plywood attic decking was broken over a vertical flue.

    f.   Connections indicate nail withdrawal and member shift.

In conclusion, Mr. Vorba stated the following:

> "In our follow-up visit of June 17, 2008 we noticed that the strut and purlin line along the west roof plane was still mostly upright where the purlins had a noticeable shift on the rafters and were rotated our of the support notches in the struts on the north, south and east roof planes. **This would be consistent with roof loads imposed from a strong wind from the west.  In the case of a tornado the load effect would have more impact potential due to the high intensity and short duration of the load.  It appears that the Swinney roof attempted to lift and then dropped back."** (Exhibit ___ & Doc. 203, Exhibit A)

6.     Former State Farm employee and insurance expert, Stephen Strzelec, identified State Farm's violations of insurance industry standards. [Doc. 208, Exhibit A-E, and Exhibit BB]

7.     State Farm's 30(b)(6) corporate representative, Kent Peterson, and Fire Team Manager on the Swinney claim, testified in his deposition on November 17, 2008 to State Farm's actions, denials, catastrophe code application and knowledge of these catastrophic tornado claims.  (Exhibit 1)

## RESPONSE TO ALLEGED MATERIAL FACTS

1.     Deny as Dean Black reported the claim to State Farm Agent Rutledge on January 16, 2006.  (Exhibit AA)

2.    Deny as State Farm's activity log on February 3, 2006 references that this was a CAT CLAIM (catastrophe claim) as State Farm was well aware that this was a high wind/tornado damage claim and had a catastrophe code assigned to the June 30, 2005 storms and tornadoes in  Kansas.   [*See* Doc. 205, Exhibit BB]

3.    Admit.

4.    Deny as incomplete, as Mr. Fehner only undertook a visual inspection, stating: **"…my visual observation of damages to the above referenced homes related to two tornadoes in the area on June 30, 2005."**  Mr. Fehner walked around the home and grounds looked inside.  He never went on the roof, declined the offer of a ladder and ignored the facts and damages pointed out to him by Dean Black (Swinney's Son) who was living at the home June 30, 2005 at the time of the high winds/tornadoes.  (Exhibit 1, Black's Affidavit)  Admit the remainder of the paragraph.  [Doc. 206, Exhibit C, Fehner's Report]

5.    Deny as it fails to state Fehner's conclusion, which was, **"Most of the problems are due to slight amounts of differential settlement…"**  [Doc. 206, Exhibit C, Fehner's Report Page 9]

6.    Admit.

7.    Deny as incomplete, as there are contract, bad faith, tort and statutory claims; however, admit and the New Mexico UJI states in part:

> **UJI  13-1702  BAD  FAITH  FAILURE  TO  PAY  A  FIRST  PARTY CLAIM states in part:**
> A failure to timely investigate, evaluate and/or pay a claim is a bad faith breach of the duty to act honestly and in good faith in the performance of the insurance contract.

8.    Deny as misleading and incomplete, as State Farm's former employee Strzelec was superintendent for the entire State of Alaska handling both auto and homeowner's claims.

He testified as to the numerous violations of State Farm's duties of good faith and fair dealing in handling this claim and failing to ever pay any of the claims for the home and garage tornado and collapse damages.  [Doc. 208, Exhibit A-E and Exhibit BB]

9.      Deny.  There is no evidence that any terms and conditions were agreed upon between the parties other than the amount of coverages.  [Doc. 1]

10.      Admit.

11.      Deny as misleading, as State Farm fails to include the portions of the homeowner's policy that provides coverages, repair and payment.  There were admissions from State Farm's claims adjusting supervisors and adjusters admitting that there is coverage for tornado and high wind damage.  However, admit that the portions set forth are in the contract. (Exhibits BB, CC and State Farm Policy)

12.      Deny as incomplete, as Engineer Vorba has inspected the home on approximately four (4) different occasions, provided reports and a deposition concluding that the home and garage were damaged by the storms resulting in the collapse.  [Doc. 113, Exhibit A & Doc 203, Exhibit A]

13.      Admit.

14.      Deny as incomplete and misleading to the Court.  While Mr. Strzelec did state that State Farm has adopted some outstanding claims manuals, policies and procedures, he also testified in this case that they failed to follow those claims manuals, policies and procedures. The complete question and answer from Mr. Strzelec's deposition was:

103

**19      Q.  Do you have an opinion as to whether did State**
**20      Farm adopt and implement their claims manuals or**
**21      standards in this case?**
**23          A.  I believe State Farm has adopted some**
**24      outstanding claim manuals and policies and procedures.  I**

**25    don't think that in this case they were either properly**

104

**1    implemented or they weren't correctly followed; one or**
**2    the other.**  (Exhibit BB)

**CONCLUSION**

This case does not merit the "drastic measure" of summary judgment as a matter of law

as there are numerous issues of material fact to be presented to and decided by the jury allowing

Swinney her constitutional right to a jury trial.

Respectfully submitted,

**/s/  Steven Vogel_____**
STEVEN VOGEL
10400 Academy Road NE - Suite #240
Albuquerque, New Mexico 87111
(505) 293-8888

I certify that on the 24th day of September,
2010, I filed the foregoing
electronically through the CM/ECF
system which caused the following
parties or counsel to be served by
electronic means, as more fully reflected
on the Notice of Electronic Filing:

TERRENCE REVO
ROGER SMITH
Revo Law Firm
10400 Academy NE - #200
Albuquerque, New Mexico 87111
(505) 293-8888

TERRY GUEBERT
Guebert & Bruckner, P.C.
tguebert@guebertlaw.com

PHILLIP A. BROOKS
Fulcher & Brooks, LLC
Mark Twain Tower
106 West 11th Street, Suite 1540
Kansas City, Missouri 64105
(816) 471-2111

BRIAN G. BOOS
Wallace Sunders
bboos@wallacesaunders.com
***Attorney for Defendant State Farm***

***Attorneys for Plaintiff***

**/s/  Steven Vogel_____**
STEVEN VOGEL

STATE OF KANSAS      )
                               ) ss.

COUNTY OF JOHNSON    )

I, Dean Black, having been duly sworn and placed under oath, states as follows:

I am over the age of 18, am competent to testify under oath, and state matters herein based upon my own personal knowledge.

On June 30, 2005 a tornado hit our home in Columbus, Kansas and I reported the claim to State Farm Insurance. State Farm did not send an engineer (Mr. Fehner) to the home until almost 9 months later. On March 14, 2006, I met Laurence C. Fehner of Norton & Schmidt, an engineer hired by State Farm Insurance to inspect the property located at 1000 E. Maple Columbus, Kansas (hereinafter referred to as "the home").

I either informed and/or showed Mr. Fehner, the following enumerated conditions and damages that resulted from the tornado of June 30, 2005:

1.       Since the tornado of June 30, 2005, there have been no significant repairs made to the home.

2.       The home was completely refurbished prior to its purchase about July, 2004.

3.       The garage structure was built a few years prior to the purchase of the home. The ceiling of the garage is covered with sheetrock.

4.       I personally toured the interior and exterior of the home and the garage with Mr. Fehner on March 14, 2006.

5.       The home is constructed of unreinforced multi-wythe stone masonry and that the foundation walls extend down into bedrock.

6.       The east and west bay windows are ORIGINAL as well as the twenty-two (22) inch thick, corbelled masonry walls behind them.



7.    I offered a ladder to Mr. Fehner to use for roof access, but he never went onto the roof of the home.

8.    I showed Mr. Fehner where the tops of the front columns of the home had shifted from their normal position.

9.    I had been tracking and monitoring a number of cracks in the interior portions of the home since the tornado, beginning approximately July, 2005.

10.    I found additional cracks in the interior portions of the home during the fall and winter of 2005.

11.    These cracks had expanded and increased in length.

12.    I had pencil-marked and dated each crack, their location, and the progress of their growth.

13.    I had drafted a chart of various events, highlights of damages to property and objects, cracks and their subsequent progress, which had developed since the tornado.

14.    I was very concerned about the cracks in the various rooms of the home and how the cracks were increasing in width and length and showed Mr. Fehner these cracks.

15.    I was concerned about the separations and cracks that I had observed in various parts of the home's roof framing and attic space.   I showed Mr. Fehner these separations and cracks.

16.    The cracks in the southeast corner and east side of the dining room had developed beginning the night of the tornado.

17.    There were new gaps and deformations in the crown moldings throughout the home.

18.    The center north-south walls appeared out of plumb and/or appeared to be buckling. For example, using a level; I pointed out deformations of the east living room wall

surrounding an electrical outlet.

19.     There are multiple cracks in the fireplace masonry, moldings, and cabinetry and separations between the ceiling and crown molding over the fireplace.

20.     There are severe deformations of the master bedroom ceiling.

21.     There are numerous nail-pops in the finish of the ceiling of the master bedroom.

22.     There is southward movement of the south slope of the roof which caused a ripple in the finish of the south end bedroom/computer room ceiling immediately after the tornado. This ripple is now almost five (5) feet long.

23.     There is a leak in the dining room ceiling and informed him that the leak appeared during the week immediately after the tornado.

24.     There are vertical and horizontal cracks on both sides of door headers around the east side of the living room and west side of the dining room, the upstairs bedrooms and bathroom; corner cracks; the interior walls of the master bedroom, northeast bedroom, southeast bedroom, and bathroom. I told to him that I suspected overloads from a shifted roof structure.

25.     The torn finish in the southwest corner of the living room which starts at the top of the wall.

26.     I heard a rumbling and felt vibration/shaking sensation under my feet when the floor moved at the end of February, 2006.

27.     The floor in the rear laundry/bath area had deformed in approximately February, 2006.

28.     There were more cracks and a loss of tile grout in the floor of the laundry/bath area which developed in approximately March, 2006.

29.   The cabinets on the south wall of the kitchen began leaning inward and pulling away from the walls in February, 2006.

30.   There was racking, which means lateral collapse/lateral movement, like twisting a shoebox, which is what happened to the garage, over the master bedroom and upstairs east side room which developed after the tornado.

31.   A vertical crack developed in the southeast corner of the northeast bedroom in approximately July 2005.

32.   There were numerous separations of wood trims and other various finishes throughout the home.

33.   There were cracked rafters, broken members, gaps in the southeast, southwest, and northwest corners, and other separations in the attic space.

34.   There was movement evidenced by nail pulls along the west wall of the home.

35.   The plywood deck on the floor of the attic was broken.

36.   The shifted attic rafters indicating lateral movement of the roof; the gap behind the scab; and the screws that had been pulled thru the scab.

37.   The center posts under the "small flat roof" in the attic were leaning westward to the west wall.

38.   I showed and explained to Mr. Fehner gaps at the tops of the center posts under the "small flat roof"; how the center posts were still loose; and that there were originally gaps of 3-fingers-, 2-fingers-, and 1-finger-width in the northwest, southwest, and southeast corners, respectively.

39.   The bending purlins indicated that the southwest quadrant and the northwest quadrant of the attic of the house had moved.

40.   The southeast corner of the garage's hip rafter was separated.

41.   Multiple corners of sheetrock in the garage had separated from the ceiling; and, the falling sheetrock formed a 'pattern of rotation' along an N-S axis and E-W axis.

42.   The top of the north wall above garage doors had moved northward.

43.   Additional signs of damage were that the electric garage doors suddenly stopped closing correctly immediately after the tornado.

44.   The east and west walls of the garage were bowing outward.

45.   There was significant damage to various trees and other objects in and around the property.   There was a 65 year old tree with a 5-foot trunk that had toppled during the storm; and pointed out where buildings 65 paces to the southwest had been destroyed by the storm.

46.   The purlins and other supports in various places of the attic were 'pressing thru the attic floor, causing serious depressions in attic floor and showing up as deformations of the ceiling of the home underneath.

47.   I specifically requested Fehner to take a photograph of one of the most obvious examples (as described in paragraph 46) of the supports which he misrepresented as "securely attached" to the floor in his report (picture #94).

48.   At the time of departure, I asked Mr. Fehner about concerns I had regarding the integrity and safety of the home. He replied, "I could have condemned it…"

49.   Mr. Fehner made malicious and insulting remarks to me, directly, when I spoke to him telephonically after reading his report and asking him about certain omissions and misrepresentations he had made.

**FURTHER AFFIANT SAYETH NAUGHT.**

DEAN BLACK

SUBSCRIBED AND SWORN to before me this _23_ day of June, 2008.

DEBORAH L. NITSCH
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. _____

NOTARY PUBLIC

My Commission Expires: _12/ 8/08_

DEAN BLACK 1/29/2009

1    A.   Yes, that's when I -- yeah.

2    Q.   All right.  Was there -- when you say it

3   was dripping down -- I think -- I know what you're

4   talking about because you filed a claim for that, I

5   think, did you not?

6    A.   No.

7    Q.   Oh, you didn't?

8    A.   No.  I called to -- I talked to Diane.  I

9   called -- I called State Farm.  That's Rutledge.

10    Q.   Uh-huh.

11    A.   And told her about it.

12    And she said, "Do you want to start a claim?"

13    And I looked at it and I'm going, "I don't know.

14   Let me tell you what.  I'll -- let me get" -- we

15   agreed between the two of us, get an estimate as to

16   what it was going to cost to fix it and then we'll

17   decide what to do about it.

18    Q.   All right.  Did you ever file a claim for

19   that water loss?

20    A.   No, not specifically, no.

21    Q.   Help me out, because what do you mean "not

22   specifically"?

23    A.   Well, because on January the 16th, 2006, I

24   had already been researching other things that

25   started appearing.  Between that time and November,

EXAA

DEAN BLACK 1/29/2009

Page 58

1   Decemberish, when I just started noticing things, I

2   started studying the structure because I suspected

3   something was wrong.

4        Q.   Uh-huh.

5        A.   And on the 16th, I called Rutledge and

6   said, "I think -- I think we've got a problem here.

7   I don't know if it's related to the water damage or

8   if the roof shifted.  I'm not sure what's going on

9   here."

10       But anyway, I think that -- I think that by that

11  time I'd figured out or whatever, deduced, that that

12  storm had shifted that roof.

13       Q.   Uh-huh.

14       A.   So we actually called it in.  We weren't

15  sure what was going on.  We knew something had moved.

16       Q.   When you went up into the attic when you --

17  when the pan, the air-conditioning pan was

18  overflowing, was there then water in the attic?

19       A.   Yes.  It was flowing over the plywood and

20  down through the insulation and through the -- you

21  know, falling through the cracks, but, yes.

22       Q.   Uh-huh.  How much of the attic then had

23  water in it?

24       A.   Since it's covered by plywood, I couldn't

25  figure that out.  I wasn't sure how wet it got, but I

ca0e1287-6c8c-4fe2-a03a-11942327fbd4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DIANE SWINNEY,

     Plaintiff,

v.                                 No. CV-08-227 WJ/ACT

STATE FARM FIRE AND CASUALTY
COMPANY, a foreign corporation,
STATE FARM ADJUSTER CODY CHAVEZ,
And JOHN DOES 1-3,

     Defendants.

## DEFENDANT STATE FARM'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW the Defendant, State Farm Fire and Casualty Company (hereinafter "State Farm"), by and through its attorneys, Guebert, Bruckner & Bootes, P.C., and submits this, its Responses to Plaintiff's First Request for Production of Documents, as follows:

**REQUEST FOR PRODUCTION NO. 1:** All claims for property damage from State Farm insureds caused by tornadoes and/or other wind phenomena within a 100-mile radius of Columbus, Kansas on or about June 30, 2005.

**SUPPLEMENTAL RESPONSE:** Objection. State Farm objects to this Request as it seeks confidential information concerning State Farm's insureds that is expected to remain protected under the right to privacy. State Farm further objects that this Request is vague as to production of "[a]ll claims for property damage," overly broad both in scope and geography, unduly burdensome and requests information irrelevant to the present matter. In addition, this



production of "[a]ll documents regarding catastrophe codes..for..damage occurring on or about June 30, 2005," overly broad both in scope and geography, unduly burdensome and requests information irrelevant to the present matter.  In addition, this Request may seek confidential trade information protected from disclosure without a confidentiality agreement and protective order.

Subject to and without waiving the foregoing, State Farm's Fire Catastrophe Estimatics and Claim Handling Practices document for Catastrophe Code PA may be responsive to this Request.  State Farm is attempting to obtain a copy of the document and will produce it if and when it becomes available.

**REQUEST FOR PRODUCTION NO. 6:**  All claims made by State Farm insureds regarding catastrophe codes assigned by State Farm for tornado and/or wind damage occurring on or about June 30, 2005.

**SUPPLEMENTAL RESPONSE:**  Objection.  State Farm objects to this Request as it seeks confidential information concerning State Farm's insureds that is expected to remain protected under the right to privacy.  State Farm further objects that this Request is vague as to production of "[a]ll claims made by State Farm insureds regarding catastrophe codes," overly broad both in scope and geography, unduly burdensome and requests information irrelevant to the present matter.  In addition, this Request may seek confidential trade information protected from disclosure without a confidentiality agreement and protective order.

Subject to and without waiving the foregoing, State Farm issued Catastrophe Code PA for a beginning date of loss of June 29, 2005.  The geographic scope of Catastrophe Code PA may have included Columbus, Kansas. Total reported claims for the states of Kansas,

4

Missouri and Oklahoma for Catastrophe Code PA were 2,398. Total indemnity paid for these

reported losses was $10,749,043.

In addition, on the above date there were 365 reported claims for Catastrophe Code PA in

Nebraska resulting in $1,649,760 indemnity paid.

GUEBERT, BRUCKNER & BOOTES, P.C.

By_____

    Terry R. Guebert
    Christopher J. DeLara
    Lisa M. Bolle
    P. O. Box 93880
    Albuquerque, NM 87199-3880
    (505) 823-2300
    Attorneys for Defendants

0101.683bf/supplemental RFP.State Farm – Federal/

5

# CYNTERGY AEC
### ARCHITECTURE · ENGINEERING · CONSTRUCTION

July 14, 2008

Swinney Residence

Mr. Dean Black
1000 East Maple
Columbus, Kansas

Dear Mr. Black,

## Review of Norton & Schmidt Reports

We have been requested by your legal council, Mr. Steve Vogel, to review the reports issued by Norton & Schmidt Consulting Engineers LLC dated March 24, 2006 and December 19, 2007, in regards to their structural investigation of your family's residence in Columbus. The March 24 report provided the observations made by Laurence C. Fehner, P.E. during his visual investigation of your residential property at 1000 East Maple, Columbus, Kansas on March 14, 2006. The December 19 report provided contrary review comments made by Mr. Fehner to our report dated October 29, 2007. Based on our review of these reports we offer the following comments:

### March 24 Norton & Schmidt Report

The report by Laurence Fehner essentially concludes that all distress to finishes and movements to roof members are the result of either foundation movements or shrinkage and deflection of newer wood framing for the remodeled first floor.

Although we concurred in our initial assessment that a settlement of floor supports below the kitchen appears to have taken place, we take exception with several of Mr. Fehner's conclusions as follows:

1. The report makes a point of the home being constructed in 1880. The connotation is that age is in itself a factor. It has been our experience doing rehabilitation of old structures, that many of these old structures are more sound than present day residential structures. For one thing, the wood utilized in these structures is of higher quality than the production lumber of today. Generally, it is common for a building structure to reach a point of equilibrium with time. Loads redistribute to supporting elements in accordance with their stiffness thru deflection and joint rotation, and resulting foundation loadings become stabilized. However, when an occupant such as Mr. Black begins hearing pops and groans from the roof structure, see new signs of distress in finishes and notices fresh evidence of joint movements, we look for some recent event that has changed the equilibrium of the system. That event was the wind storm of June 30, 2005 in which two tornadoes were recorded in the area.

2. The report states that the two-story stone walls are founded on shallow stone masonry foundation walls. We have not explored the depth of the foundation walls, but from viewing the bearing walls adjacent to the cisterns each side of the house, they appear to be several feet in depth -- at least at the cistern. Other than the patched mortar above the windows on the west wall, the stone walls appear sound. If foundation movements were an on-going phenomena, there should be more distress throughout the masonry walls particularly at corners and thru openings.

*CYNTERGY AEC* LLC
320 South Boston
12th Floor
Tulsa, OK 74103
918-877-6000
Fax 918-877-4000

3. The report states that several buildings southwest of this home were completely lost and trees south of the property were knocked down and lost. What it fails to state is that the destroyed buildings were within a good stone's throw from this home and the largest of the downed trees was in the Swinney lot.

4. The observations made in the attic do not address the evidence of recent cracks, splinters, joint separation and nail withdrawl found in a number of locations documented in our report of October 29, 2007 and our subsequent narrative dated June 23, 2008. It also dismisses the broken plywood section as not related to high wind loads. However, Mr. Black is adamant that he found the broken plywood immediately after the storm. The fact that this plywood covered a masonry flue that extends to the crawlspace beneath the house; was attached to a ceiling joist that also supports a roof strut and is located at front of the house where the entry canopy framing ties in with the main roof structure appears to have no merit. Although it is a mysterious failure, the fact that the flue provided a path for equalizing air flow to the attic area and the strut provided a source of sudden differential movement from the roof, there is a potential for combined load effects to cause such a tear.

5. The report discusses the movement of the purlin bracing in the attic. It notes that some of the nails were not "shiny" in a notched joint that was separated between purlin and strut. Photo 18 (5/10/2006) in the Cyntergy report shows an outrigger connection at the eave that appears to have been separated for some time, due to the rusty color of the nail; however, Photo 34 (5/10/2006) shows one of the purlin/strut connections where the nails appear "shiny". Clearly if shiny means recent pullout, there is also evidence of recent joint separation in the attic.

## December 19 Norton & Schmidt Report

As stated earlier, this report provides several concerns and offers differing opinions to those expressed by Cyntergy AEC in our report dated October 29, 2007 and our narrative dated June 23, 2008. We wish to offer the following responses to these concerns as follows:

1. The age of the structure was already discussed in item 1 above for the March 24 report. In addition to the structure's age, Mr. Fehner incorrectly states that Cyntergy makes no allowance for other possible explanations for the conditions other than high wind. We discussed the possibility of kitchen support settlements in the report and provided several photos. In the same paragraph Mr. Fehner references several conditions in the attic and one condition of a previous repair to a crack over the door between the living room and hall as conclusive proof that the shifting and movement were not recent. The Fehner report fails to discuss the multiple conditions noted in the Cyntergy report that indicate more recent signs of movement and what appears to be fresh cracks and splinters in some of the framing members.

2. The second concern addresses the point that the signs of movement and distress appear to be occurring some time after the June 2005 storm. This fact has led has led us to a different conclusion than Mr. Fehner. If a sudden uplift force was applied to the roof and then released (say a tornado passing overhead or nearby) the initial uplift force could strain connections and separate joints allowing some shift of members. If the load is then released, gravity would take over and the resulting reverse loading would include some degree of impact. This impact force we believe caused some of the new cracking, support shifting and splintering of support framing in the roof. Due to shifts, breaks and joint separation, the roof loads began to redistribute to the supports – again based on the new configuration of stiffness. This redistribution effort we believe has created the noises heard by Mr. Black and could also be a cause of some of the new stress conditions noted in the finishes.

3. The report next enters into a discussion of the flooding to the crawlspace from the internal roof drain line. Since the flooding was discovered some time after the wind event, it was determined that it was not related. Here again, we contend that the uplift of the roof could have broken or distressed the joints in the drain line enough to cause the leak. It would take a considerable amount of time and water to flood a dry crawl space. Once flooded, the potential for movement

C Y N T E R G Y   A E C llc
320 South Boston
12th Floor
Tulsa, OK 74103
918·877·6000
Fax 918·877·4000

of the shallow supports below the kitchen would be increased due to saturation of the subgrade soils.

4.  Mr. Fehner also questions the level of the Fujita scale selected in the Cyntergy report as a gauge for assessing possible wind speeds generated by the June 30 tornado. What was stated in the report was; "Although the Swinney residence did not suffer all of the damage effects listed, (for an F1 moderate tornado) all of the effects were observed all around the Swinney property following the event. The national weather service estimated straight line wind speeds of 70 to 100 mph associated with the June 30 storm. Wind events such as tornados must have very complex wind patterns and pressures due to all of the strange stories that accompany these disasters. Whether or not the chimney of the Swinney house was damaged may be more a function of the massive stone used in the Swinney residence versus modern day construction rather than a true assessment of wind speed. Also, the loss of shingles or windows broken does not necessarily correlate to a given wind speed. My personal residence was within the zone of a microburst a couple of years ago where tree limbs as large as 12 inches were snapped off and thrown over the house and a telephone pole on the lot line within 50 feet of the house was snapped in two. We did not lose 1 shingle or have 1 broken window. The Fehner Norton & Schmidt report does not mention the 5'-0" diameter tree that was blown over not more that 200 feet from the house or the metal buildings completely destroyed approximately the same distance to the southeast. The point we were trying to make is that even if the storm passed overhead quickly, the potential for a sizeable uplift on the roof structure was high.

5.  The withdrawal values for the nails at the connections were questioned. The withdrawal capacity is a function of nail size and wood density. The lower value calculated was for Spruce Pine Fir lumber, the upper value for Douglas Fir (North). We used values from the 2005 National Design Specification for Wood Construction. These values were used to bracket in a possible range of densities. We do not agree with the use of a factor of safety of 3 to 4 when making the withdrawal calculations (Breyer mentions average factors of safety for wood properties to be in the order of 2.5 in the 3rd edition of Design of Wood Structures). However, the fact remains that there is evidence of nail withdrawal on a number of connections.

6.  The report questions uplift effects on the first floor framing, which was not a conclusion of the Cyntergy report. We refer to the response to item 2 above concerning the redistribution of roof loads due to the wind loading effects as a factor in the distress noted in the finishes below.

7.  The repair recommendations made in our October 29 report were also questioned. The purpose of these repairs were to provide an adequate system for support of the roof loads as well as provide mechanical ties to aid in resisting future uplift effects. It is our opinion that a sound system of support will direct the roof loads to the framing elements properly reinforced to withstand them. Once in place, the roof structure should again reach a state of equilibrium.

We hope this review of Norton Schmidt reports is of assistance to your council. If you have any questions or need further clarification on any of the items discussed in this narrative or contained in our final report dated October 1, 2007, please notify me.

Sincerely,



Larry L. Vorba, PE, PMP
Director of Structural Engineering
Cyntergy AEC

llv

*CYNTERGY AEC* llc
320 South Boston
12th Floor
Tulsa, OK 74103
918-877-6000
Fax 918-877-4000

# CYNTERGY AEC
### ARCHITECTURE · ENGINEERING · CONSTRUCTION

October 28, 2007

Swinney Residence

Mr. Dean Black
1000 East Maple
Columbus, Kansas

Dear Mr. Black,

**Structural Engineering Investigation Report**

We have performed visual investigations of your mother's residential property, where you currently reside at 1000 East Maple, Columbus, Kansas on May 10, 2006 and again on June 3, 2006.  From these investigations and subsequent analysis of the existing roof framing system, we have developed construction documents for the purpose of "shoring up" the existing roof structure and strengthening the support system to the foundations.  The purpose of this report is to present a summary of our observations including our conclusions as to the cause of noticeable movements of the roof framing and distress to finishes observed in the Swinney residence and recommendations for repair.

**Observations**

1.  A noticeable deflection was seen in the ceiling of the large upstairs bedroom on the west side of the house.

    a.  The exterior west wall appears to have moved outward with signs of distress above the arched window.  Evidence of previous joint patching was observed. (5/10- 00001, 00003)

    b.  This large upstairs bedroom was created by removing an east-west load bearing wall during a previous remodel by installing a fabricated steel section in the attic that supports the ceiling joists over this room and bears on the west wall. (6/3 – 00001 thru 00004)

2.  Cracks in the plaster walls and signs of movement were observed in multiple areas of the house:

    a.  The downstairs entry hall; (6/3 – 00030)

    b.  The dining room; (6/3 – 000043, 00044)

    c.  The living room; (6/3 – 00048)

    d.  The upstairs hall and casework; (6/3 – 00031 and 00038, 00039)

    e.  The upstairs bedroom and closet. (6/3 – 00028, 00029

CYNTERGY AEC LLC
320 South Boston
12th Floor
Tulsa, OK 74103
918-877-6000
Fax 918-877-4000

3. The kitchen floor appears to have shifted:

    a. The kitchen cabinets have pulled away from the kitchen wall. (6/3 – 00045 thru 00047)

    b. The ground floor framing was reinforced by the previous owners sometime in the 1980's. Investigation of the crawlspace found that some of the supplemental supports for the floor framing appear to have shifted. Similar supplemental supports were seen under the kitchen area thru an opening in the stem wall between the kitchen and the dining room crawlspace. (6/3 – 00051, 00053, and 00057)

4. The roof framing observed in the attic showed signs of recent movement:

    a. Roof rafter support purlins have moved in relation to the rafters; (6/3 – 00008)

    b. Struts are separated from the purlins; (5/10 – 00033-00034; 6/3 – 00016 thru 00021)

    c. Outriggers are pulling loose from anchor rafters; (6/3 – 00006, 00007)

    d. Several rafters and ceiling joists were found cracked;

    e. A section of the plywood attic decking was broken over a vertical flue. (6/3 – 00031-00032).

5. Evidence of roof framing movement was also seen in the adjacent unattached garage structure south and west of the Swinney residence, but not to the degree as that observed in the residence. The garage roof framing would benefit from a similar "shoring" effort to that proposed for the roof of the residence, but no analysis or design work was developed for the garage.

## Additional Information

1. A thunderstorm with strong wind and reported tornadic activity ravaged Columbus, KS on June 30, 2005.

    a. A small tree was snapped off at the ground level and blown approximately 40 yards north just west of the Swinney residence.

    b. Several buildings approximately 50 yards south and west of the Swinney residence were damaged during the storm.

    c. A neighbor's garage just east of the Swinney residence suffered diagonal cracking in the masonry walls.

    d. A large tree south and east of the Swinney residence was overturned during the storm.

    e. Tomato plants were blown flat just south of the Swinney residence during the storm.

    f. The national weather service confirmed that a tornado was spotted at this location during that storm.

2. In the weeks and months following the storm the following events occurred:

    a. The storm drain line broke below the house flooding the crawl space.

CYNTERGY AEC llc
320 South Boston
12th Floor
Tulsa, OK 74103
918-877-6000
Fax 918-877-4000

b. Creaks and popping noises were heard throughout the house.

c. Cracks were noticed in the plaster walls in the master bedroom, upstairs hallway, downstairs dining room, living room and entry way.

d. The floor in the kitchen shifted suddenly and loudly and offsets in the kitchen cabinets were found.

Analysis

1. The effects of the storm event on June 30, 2005 at or near the Swinney residence appear to coincide with the damage effects of a moderate tornado outlined in the Fujita Scale as an F1 Moderate tornado (FEMA 361 Table 3.1 attached) – "Roof surfaces are peeled off, windows are broken, some tree trunks are snapped, unanchored manufactured homes are overturned, attached garages may be destroyed." Although the Swinney residence did not suffer all of the damage effects listed, all of the effects were observed all around the Swinney property following the event.

2. The First Edition FEMA 361 publication dated July 2000, "Design and Construction Guidance for Community Shelters", has a correlation between the Fujita Scale and corresponding wind speeds.   Table 10-1 (attached) gives a range of 78 to 118 mph for a 3-second gust.   The International Building Code uses the same 3-second gust wind speed criteria for establishing wind loadings on buildings.   While a tornado includes the complicating factor of the vortex effects with wind loadings, a range of magnitude for wind pressures potentially incurred by the Swinney residence during the storm can be calculated using the 3-second gust wind speeds.

3. We have calculated wind load values for the code design wind load of 90 mph and the corresponding value for a 118 mph event.   Both were calculated for an enclosed structure in an exposure B category although with the open scattering of structures to the south of the Swinney residence the exposure could be potentially higher from this direction.

   a. For tributary areas in the range of 75 square feet the wind uplift loads on the roof are as follows:

      i. 90 mph:  Zone 1 – 12.09 psf; Zone 2 – 18.26 psf; Zone 3 – 28.19 psf.

      ii. 118 mph: Zone 1 – 20.78 psf; Zone 2 – 31.39 psf; Zone 3 – 48.36 psf.

   b. Note that with the increase in wind speed from 90 to 118 mph a corresponding increase of 71.5% in wind pressure results.

4. The values used for design of the "shoring" of the existing roof system were for the estimated gravity loadings and the code required live and wind (90 mph) loads.   It is obvious that any wind event causing winds higher than 90 mph can result in significant overstresses to framing members and connections due to the increased pressures.

Conclusions

1. Irrefutable evidence of strong winds causing significant damage immediately adjacent to and all around the Swinney residence, indicates that the residence was exposed to high winds and possibly tornadic activity during the storm of June 30, 2005.

CYNTERGY AEC LLC
320 South Boston
12th Floor
Tulsa, OK 74103
918: 877: 6000
Fax 918: 877: 4000

a.  The shifts to roof rafter support purlins and separation of the struts from the purlins are consistent with reverse stresses created by wind uplifts on the roof.  Calculations of uplift loads for a 90 mph code wind event resulted in uplift loads ranging from 12.09 to 28.19 psf.  For wind speeds of 118 mph (the upper range given for F1 tornadic events) the calculated uplifts loads would range from 20.78 psft to 48.36 psf (a 71.5% increase).

    i.  Common connections utilize 8d nails.  An 8d nail pullout value for Spruce Pine Fir is in the range of 33.6 to 48 pounds per inch of penetration.  For a ½ inch pullout, assuming a safety factor of 2.5, the force required would be in the range of 42 to 60 pounds.

    ii.  Using the potential uplift loads on the roof and the relatively low resistance to pullout for the nailed connections, the observed shifts and separations would be highly possible.

b.  It is unlikely that the wind uplifts were uniform over the roof especially if a tornadic vortex was present.  The resulting unbalanced loads would contribute to the observed shifts and separations and could have overloaded the supporting ceiling joists found cracked.

    i.  The resulting shifts of load support for the roof framing, could cause increased thrusts on the perimeter support walls – thus the pullout of outriggers and west wall movement observed.

    ii.  These shifts in load could also cause overloads in the subsequent load path support elements resulting in additional distress – thus the cracking and popping noises and new cracks in plaster wall finishes.

    iii.  The sudden shift in the kitchen framing was witnessed by Dean Black and is attributed to a failure of one of the sandstone blocks at the intersection of the west north south load bearing wall and the north kitchen load bearing wall.

2.  The movements and load shifts noted in item 1 above could also have overstressed the storm drain line that leaked into the crawlspace.

a.  Flooding the crawlspace could have initiated additional differential movements of the supplemental floor supports.  Most of these supports bear on surface soils, so any settlements of the subgrade soils due to consolidation aided by wetting would result in loss of load carrying capacity.

    i.  The resulting movements observed in the kitchen would be consistent with the sudden loss of support due to the support block failure and the subsequent movement of the supplemental supports below the kitchen floor.  The floor framing in this area has a significant load from the kitchen island with a concrete counter top.

## Recommendations for Repair

1.  Reinforce the roof framing per the construction documents previously prepared (copies attached).  By installing new support framing and reinforcing the bearing conditions for this framing, the movements of the roof framing can be stabilized; thrusts to the perimeter walls will

CYNTERGY AEC llc
330 South Boston
12th Floor
Tulsa, OK 74103
918 877 6000
Fax 918 877 4000

be eliminated thus allowing the west wall to be repaired; and the ceiling joists and interior walls will no longer be overloaded reducing the potential of overstresses to the plaster finishes.

   a. In addition, hurricane ties should be installed between rafters and bearing plates to aid in resisting uplift forces. Refer to the construction documents for hurricane tie requirements for the new support framing.

   b. Anchorage of the wall to the second floor framing, would also provide additional stability to the east and west walls, that do not support floor joists as do the north and south walls.

2. The floor below the kitchen and dining room should be leveled by jacking and re-supporting the floor joists. Screw-type permanent floor jacks with stable concrete pedestals should be used to provide suitable supplemental support.

We appreciate the opportunity to perform this structural investigation for you. If you have any questions or need further clarification on any of the items contained in this report, please notify me.

Sincerely,


Larry L. Vorba, PE, PMP
Director of Structural Engineering
Cyntergy AEC
Enclosure (39)


llv

CYNTERGY AEC llc
320 South Boston
12th Floor
Tulsa, OK 74103
918-877-6000
fax 918-877-6000

Stephen L. Strzelec                              May 14, 2010

Page 103

1     I don't think they correctly applied it, and I don't

2     think they correctly looked at the entire policy with the

3     denial, you know.  They didn't consider any additional

4     coverages including collapse as well.

5          Q.   Do insurance companies like State Farm adopt

6     some kind of claims manuals or standards for claims

7     adjusting?

8          A.   I have reviewed claim manuals for, I don't

9     know, well over a dozen companies.  I couldn't name all

10    the companies I've reviewed their claim manuals, but

11    every company I've ever been involved with has got claim

12    manuals and policies and procedure for the handling of

13    claims, yes, and State Farm does as well.

14         Q.   Is State Farm supposed to follow their own

15    claim guidelines or claim manuals?

16         A.   Yes.  The standard is to adopt and implement

17    those standards.  The implementation is to follow and

18    force those claim handling standards.

19         Q.   Do you have an opinion as to whether did State

20    Farm adopt and implement their claims manuals or

21    standards in this case?

22              MR. GUEBERT:  Object to the form.

23         A.   I believe State Farm has adopted some

24    outstanding claim manuals and policies and procedures.  I

25    don't think that in this case they were either properly

Stephen L. Strzelec                    May 14, 2010

Page 104

1    implemented or they weren't correctly followed; one or

2    the other.

3         Q.   Based upon what you've testified to before and

4    all the other information?

5         A.   Yes.  Based on my prior testimony and all the

6    information I've reviewed.

7         Q.   Why is it important for an insurance company to

8    try to settle catastrophic claims within, say, a 90-day

9    period of time?

10        A.   That's a good question.  Several states

11   actually have regulations that require CAT claims to be

12   contacted and settled within a specific period of time.

13   CAT claims especially just because they -- well, all

14   claims can cause hardship and hardship on insurance, but

15   CAT claims can be -- I was going to say catastrophic, but

16   that would be really redundant -- CAT claims can impact

17   not only just an individual insured but an entire area

18   and have ramifications much beyond an individual loss.

19        Q.   Did State Farm settle Swinney's claims within

20   90 days?

21        A.   No, they did not.  90 days had expired from the

22   time it was reported until I believe it was probably

23   about 90 days by the time they got back the engineer's

24   report.

25        Q.   Do you have an opinion as to whether State Farm

Stephen L. Strzelec                                    May 14, 2010

Page 94

1    was caused by this wind event.
2        Q.  Do you see anything that State Farm considered
3    this series of storms in the catastrophe code that they
4    applied when they adjusted Swinney's claim?
5        A.  There are mentions in the agent's logs and
6    different places within the claim file that it was
7    reported as being damage from the tornado, but I don't
8    see where there was any real strong investigation
9    regarding it being wind damage.  I think the engineer's
10   report said, "Look at this.  It's settling," and they
11   went with that instead of investigating that possibility.
12       Q.  Did you read State Farm's Fire Team Manager
13   Kent Peterson's deposition?
14       A.  Yes, I did.
15       Q.  Did you see Mr. Peterson agreed that the
16   insurance company has a duty to timely and thoroughly
17   investigate, evaluate and pay claims?
18       MR. GUEBERT:  Object to the form.
19       A.  That's correct, yes.
20       Q.  And you agree with that statement?
21       A.  I agree with that statement.
22       Q.  Do you have an opinion as to whether State
23   Farm, part of their adequate investigation was never
24   speaking with David Bush, the home inspector who was also
25   a FEMA inspector?

Page 95

1        MR. GUEBERT:  Object to the form.
2        A.  I believe that once they were made aware of
3    Mr. Bush that clearly the investigation required for them
4    to contact him and find out what information he had that
5    would help them complete their investigation.
6        Q.  Was Mr. Bush one of the few people who
7    inspected Swinney's home before the June 30, 2005, high
8    winds and tornadoes and inspected it after that time?
9        MR. GUEBERT:  Object to the form.
10       A.  I believe he's one of the few disinterested
11   parties, objective disinterested parties that actually
12   was identified as having done both those things, yes.
13       Q.  Why would it be important to talk to someone
14   like Mr. Bush if you're trying to do a thorough and
15   complete investigation?
16       A.  Well, he has information that is pretty much
17   parallel to an eye witness account.  While he didn't see
18   the actual wind event himself, he was aware of the
19   condition of the structure just prior to the loss and
20   could compare it to the damage that occurred afterwards
21   and would be probably the person that's in the best
22   position to describe what had transpired between before
23   and after and the amount of damage that actually had
24   occurred over that short period of time.
25       Q.  And you read Ms. Swinney's deposition?

Page 96

1        A.  Yes, I did.
2        Q.  Are you aware that on August 8, 2007,
3    Ms. Swinney wrote a letter to State Farm requesting
4    reimbursement for the $1,129 she had paid to the
5    construction company to repair the high wind or tornado
6    damage to her garage?
7        MR. GUEBERT:  Object to the form.
8        A.  I'm aware of that, yes.
9        Q.  Do you have an opinion as whether or not that
10   was a breach of contract for State Farm to refuse to
11   reimburse Ms. Swinney for that payment for damage to her
12   garage?
13       MR. GUEBERT:  Object to the form.
14       A.  I believe that their denial of the garage claim
15   was inappropriate, as the damage to the garage was never
16   really investigated or addressed at all other than the
17   denial letter.
18       Q.  Mr. Guebert has asked you a series of questions
19   regarding, he used the term malicious, I think.  Do you
20   I would like to ask you a question.  Do you
21   believe that the denial of these claims was intentional?
22       A.  Well, I think I was asked that before.  I
23   believe it's clear that the denial was done
24   intentionally.  They intended to deny the claim, and they
25   denied the claim.

Page 97

1        Q.  Was it done willfully and knowingly?
2        MR. GUEBERT:  Object to the form.
3        A.  Yeah.  They did it with intent knowing that
4    they were denying the claim when they denied the claim.
5    It was willful and intentional and knowing, yes.
6        Q.  Based on your experience and everything you've
7    reviewed and testified to, do you think State Farm was
8    aware that if they denied these claims of Ms. Swinney's
9    for the tornado and high wind damages that that would
10   cause harm or damage to her?
11       MR. GUEBERT:  Object to the form.
12       A.  I believe that State Farm is always aware of
13   the fact that when they deny a claim for damages that it
14   has negative financial ramifications to their
15   policyholder, so I believe they were aware of that when
16   they denied the claim that it was going to cause her
17   financial harm.  I think that happens every time a claim
18   is denied.
19       Q.  Do you have an opinion as to whether State Farm
20   knew that they would benefit by denying this claim in
21   that they got to keep those funds for almost five years
22   now?
23       MR. GUEBERT:  Object to the form.
24       A.  It's pretty common sense.  Every time you pay a
25   claim, the money goes to the policyholder, and that's

25  (Pages 94 to 97)

Stephen L. Strzelec                                   May 14, 2010

Page 98

1   money they don't have to pay out of their own pocket for
2   damages.
3       Every time you deny a claim, State Farm or the
4   insurance company keeps that money, and then the insured
5   has to pay for repairs out of their own pockets.
6       So any time there is a denial, it financially
7   benefits the insurance company. Every time a claim is
8   paid, it provides benefit to the insured. So it's an
9   exchange of money. That's what happens.
10      Q. Do you have an opinion as to whether or not
11  State Farm should have hired a meteorologist to help
12  determine the cause of the damages from the June 30,
13  2005, winds or tornado event?
14          MR. GUEBERT: Object to the form.
15      A. I believe if the insured is telling the
16  insurance company that they suffered wind damage, and
17  there is a question as to whether or not there was a
18  significant wind event at the insured's location or in
19  the general locale, that a meteorologist would help
20  identify that question.
21      If, in fact, the insurance company acknowledges
22  the fact that yes, there was a tornado in that vicinity,
23  then there is probably no need to hire a meteorologist
24  because they've already acknowledged that, so they don't
25  need to investigate that.

Page 99

1       If they are uncertain, then a meteorologist
2   would probably be appropriate.
3       Q. Do you understand that Ms. Swinney is only
4   requesting that the home be repaired for the damages
5   caused by the June 30th, 2005, high winds and tornado
6   event as well as the collapse of that wall underneath the
7   kitchen and I think maybe in other parts of the house?
8       A. I'm aware that there is an estimate to repair
9   for about $155,000.
10          MR. VOGEL: As a matter of fact -- may I
11  have your stamp?
12          (Exhibit 0 marked for
13          identification.)
14      Q. Let me show you what I've marked as Exhibit 0
15  and ask you if you've seen that before.
16      A. Yes, I have. It's the estimate or the bid to
17  make the repairs to the Swinney home.
18      Q. And if I may, if you look on Page 3, it shows
19  structural repairs for about 69,000 and change and floor
20  leveling, 86,000 and change; do you see that?
21      A. Yes, I do.
22      Q. When an insurance company gets the additional
23  information such as this Exhibit 0 from, it looks like
24  the Ross group -- I believe Steve Ortwein prepared it --
25  what's their obligation regarding that new information?

Page 100

1           MR. GUEBERT: Object to the form.
2       A. Well, I've already talked about it before. Any
3   time new information is made available to the insurance
4   company, they need to add it to their investigation,
5   evaluate that information and make the decision as to
6   whether or not that information impacts their claims
7   decision or their claims handling.
8       Q. Do you have an opinion what State Farm should
9   have done when they became aware of the information
10  contained in Exhibit 0 from Mr. Ortwein for the repair of
11  the tornado and wind damage to the home?
12          MR. GUEBERT: Object to the form.
13      A. Well, I would think they would review, and I
14  believe prior to this, it was the original contractor's
15  opinion that the building had to be demolished and
16  rebuilt, but then it was going to be a very expensive
17  proposition. So, in fact, getting an estimate for
18  $155,000 for this work is probably I would think actually
19  to State Farm's benefit.
20      Q. Do you have an opinion as to whether State Farm
21  violated its standard to the industry and its duties by
22  failing to contact Ms. Swinney and/or the Triple ABC
23  contractor regarding the repair damage to the garage --
24          MR. GUEBERT: Object to the form.
25      Q. -- before they denied it?

Page 101

1           MR. GUEBERT: Same objection.
2       A. Any time you deny a claim without conducting an
3   adequate investigation is in violation of industry
4   standards and the obligations of good faith and fair
5   dealing. The investigation regarding the garage was not
6   completed, in fact, almost was nonexistent before denying
7   it. They should have contacted Mrs. Swinney, recontacted
8   the engineer, done some investigation to make the
9   determination as to what the specific damages were and
10  what caused them prior to denying the claim for the
11  garage.
12      Q. Do you have an opinion as to whether it was the
13  inadequate investigation regarding Engineer Fehner's
14  deposition or report which indicates that he made visual
15  observations of the property damages and made assumptions
16  regarding existing conditions?
17      A. I believe that engineer's report is not
18  adequate to arrive at the conclusion of settling without
19  running some tests.
20      I've been involved in several cases where there
21  has been collapse and/or settling. R&M is one of them,
22  you know. The engineers ran core samples, ran all sorts
23  of tests to determine the soil conditions and whether the
24  soil conditions would allow for settling. I didn't see
25  any of that done. I think that there was a lot of

26 (Pages 98 to 101)

Stephen L. Strzelec                                    May 14, 2010

Page 102

1    assumptions made in that conclusion. That's why I
2    question the report, and I think any experienced adjustor
3    or claims persons would question that report and have
4    questions.
5           That was kind of redundant, wasn't it?
6       Q. Do you think that State Farm misrepresented any
7    of the facts of their investigation to Ms. Swinney when
8    they denied the claim?
9           MR. GUEBERT: Object to the form.
10      A. In denying the claim I think that they took a
11   very narrow focus -- same as the engineer did -- and
12   elected to ignore an awful lot of the information. And
13   so in denying the claims, the representations they made
14   to the insured in the denial was based solely on a real
15   narrow perspective instead of all the information that
16   was available in spite of the fact it wasn't a complete
17   investigation.
18      Q. Do you have an opinion as to whether State Farm
19   misrepresented the policy provisions relating to the
20   coverage here?
21          MR. GUEBERT: Object to the form.
22      A. They denied it based on the exclusion for
23   settling. I don't think the exclusion for settling
24   applies in this case, so I don't think the denial was
25   appropriate in that they correctly quoted the language.

Page 103

1    I don't think they correctly applied it, and I don't
2    think they correctly looked at the entire policy with the
3    denial, you know. They didn't consider any additional
4    coverages including collapse as well.
5       Q. Do insurance companies like State Farm adopt
6    some kind of claims manuals or standards for claims
7    adjusting?
8       A. I have reviewed claim manuals for, I don't
9    know, well over a dozen companies. I couldn't name all
10   the companies I've reviewed their claim manuals, but
11   every company I've ever been involved with has got claim
12   manuals and policies and procedure for the handling of
13   claims, yes, and State Farm does as well.
14      Q. Is State Farm supposed to follow their own
15   claim guidelines or claim manuals?
16      A. Yes. The standard is to adopt and implement
17   those standards. The implementation is to follow and
18   force those claim handling standards.
19      Q. Do you have an opinion as to whether did State
20   Farm adopt and implement their claims manuals or
21   standards in this case?
22          MR. GUEBERT: Object to the form.
23      A. I believe State Farm has adopted some
24   outstanding claim manuals and policies and procedures. I
25   don't think that in this case they were either properly

Page 104

1    implemented or they weren't correctly followed; one or
2    the other.
3       Q. Based upon what you've testified to before and
4    all the other information?
5       A. Yes. Based on my prior testimony and all the
6    information I've reviewed.
7       Q. Why is it important for an insurance company to
8    try to settle catastrophic claims within, say, a 90-day
9    period of time?
10      A. That's a good question. Several states
11   actually have regulations that require CAT claims to be
12   contacted and settled within a specific period of time.
13   CAT claims especially just because they -- well, all
14   claims can cause hardship and hardship on insurance, but
15   CAT claims can be -- I was going to say catastrophic, but
16   that would be really redundant -- CAT claims can impact
17   not only just an individual insured but an entire area
18   and have ramifications much beyond an individual loss.
19      Q. Did State Farm settle Swinney's claims within
20   90 days?
21      A. No, they did not. 90 days had expired from the
22   time it was reported until I believe it was probably
23   about 90 days by the time they got back the engineer's
24   report.
25      Q. Do you have an opinion as to whether State Farm

Page 105

1    failed to deliver quality or quantity of the goods or
2    services that she'd purchased, namely the State Farm
3    policy protection coverage?
4           MR. GUEBERT: Object to the form.
5       A. Yeah. Part of what you purchase when you buy
6    an insurance contract is that objective, even handed,
7    thorough investigation. You pay for that too. And in
8    this case, she did not receive the benefits that she paid
9    for with the policy.
10      Q. Do you have an opinion as to whether State Farm
11   took advantage of Ms. Swinney's lack of knowledge,
12   ability or experience to a gross and unfair degree?
13          MR. GUEBERT: Object to the form.
14      A. I believe that when it comes to insurance
15   claims, the adjustor of the insurance company have much
16   greater knowledge than the average insured and probably
17   much greater knowledge than the average insured even when
18   they're represented. So to the extent that they failed
19   to fulfill their good faith obligations, I believe so,
20   yes.
21      Q. Do you think State Farm's rights have been
22   prejudiced in any way by the policyholders?
23          MR. GUEBERT: Object to the form.
24      A. I don't see how anything that the insured has
25   done has prejudiced State Farm insurance in any way.

27 (Pages 102 to 105)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


DIANE SWINNEY,

                Plaintiff,

vs.                              No. CV-08-227-MCA/ACT

STATE FARM FIRE AND CASUALTY
COMPANY, a foreign corporation,
STATE FARM ADJUSTOR CODY CHAVEZ,
and JOHN DOES 1 through 3,

                Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF

KENT PETERSON


November 17, 2008

9:11 a.m.


Holiday Inn Express

11130 Ambassador Drive

Kansas City, Missouri


Naola C. Vaughn, CCR, CRR, RPR

Missouri CCR No. 1052, Kansas CCR No. 0895



KENT PETERSON

5

5    Q.   Okay.  Can you tell us who are you employed
6  with?
7    A.   I'm employed with State Farm Fire and
8  Casualty Company out of Columbia, Missouri.
9    Q.   Can you tell us, first, what is your job
10  title and then what's the job description, what do you
11  do?
12    A.   My job title currently is I'm a fire team
13  manager in our Fire Claim Central environment in
14  Columbia, Missouri.  We handle property claims for
15  Kansas and Missouri.
16         I also am the fire team manager for the
17  Central Zone Boat Unit, when handles all of the boat
18  claims for a five-state area, including Arkansas,
19  Louisiana, Missouri, Oklahoma, and Kansas, and
20  supervise the claim processor group.

6

9    Q.   Can you give me an idea how is it set up --
10  how does State Farm set up the country?  Is it to -- do
11  they do it by region?
12    A.   That's correct.  We're set up on -- in zones.
13  For instance, the Central Zone consists of a five-state
14  area.  And our zone -- that zone would be the states I
15  mentioned, Arkansas, Louisiana, Oklahoma, Missouri, and
16  Kansas.  There are 13 zones that are established across

12

11    Q.   What's the extent of your authority for being
12  able to settle, like, tornado claims?
13    A.   My authority is 300,000.
14    Q.   So I got a case like Diane Swinney's, if it
15  costs less than 300,000 to repair her home, you could
16  approve something like that?
17    A.   That's correct.

22

9    Q.   Do you have a sense, based on your
10  experience, how long does it usually take if there's,
11  you know, been tornado damage and then it gets
12  repaired, and then before people are finally able to
13  move back into their house?

22

15    A.   Generally speaking, you know, in a town that
16  it's a traumatic event, you know, such as the
17  Oklahoma City event, the Greensburg event, the

18   resources become limited and the infrastructure of the
19   town in trying to just get back those basic
20   infrastructure needs.  But, you know, 6 to 12 months
21   would be a general timeline that we would be looking
22   at.
23      Q.   BY MR. VOGEL:  And -- okay.  So this -- the
24   policies -- the State Farm policies like what Diane
25   Swinney has, they're designed to cover like if you have

23

 1   a tornado?

23

21      Q.   BY MR. VOGEL:  Okay.  And if you determined
22   it was a related event, then do you go in and repair
23   all of the tornado damage to that particular house?
24      A.   We would go in and write an estimate for the
25   repair of that damage.  If the capacity of that was

24

 1   beyond what we could either see from a -- you know,
 2   from a visual standpoint, then we may ask for a
 3   contractor to assist in that preparation.  Meet a
 4   contractor generally is what we would do to try to
 5   develop a scope that is agreed upon from a repair
 6   process.  But, yeah, we would -- we would -- yes, we
 7   would provide an estimate to the policyholder for the
 8   repair.

25

13      Q.   Like it damages the walls and maybe inside
14   the walls, you got some cracking or tearing or in the
15   ceilings or whatever.
16          Is that the purpose of the contractor; so
17   they can get in and try to figure out what the other --
18   the damage is, what's causing the cracking in the
19   ceilings or the walls or whatever?
20      A.   Yes.  You know, we would certainly work with
21   a policyholder's contractor, if they had a contractor
22   that they would -- were working with to do the repairs.
23   It makes sense, from the policyholder's standpoint, for
24   us to have communication with them.  They have
25   expertise in repairing damages.

30(b)(6)

26

11    Q.  So, Mr. Peterson, they've got you here today
12  as the 30(b)(6) witness.  Do you know what that is?
13    A.  Yes.
14    Q.  What's your understanding?
15    A.  My understanding is I have a good familiarity
16  with the fire claim process handling, understanding of
17  the contract, policy coverages, workflow procedures as
18  it pertains to all types of losses with State Farm.
19    Q.  And that would include tornado losses?
20    A.  Correct.

27

4      So you're the person most knowledgeable about
5  handling these tornado-like claims like Swinney has?
6    A.  Correct.

49

23    Q.  Do you remember what basis the claim was
24  denied?
25    A.  The claim was denied based on our evaluation,

50

1  review of the engineer's report, settling, cracking,
2  earth movement, were the parameters of denial based on
3  our losses-not-insured language.

52

1    Q.  BY MR. VOGEL:  So as we sit here today, is
2  State Farm still denying the claim based upon the
3  engineer's settling report?
4    A.  Based upon our policy language.
5    Q.  And isn't the focus, though, that the
6  engineer said that somehow the house settled?
7    A.  Correct.

56

19    Q.  And so the, in this case, wind or tornado
20  damage would apply to both the dwelling and the garage?
21    A.  Correct.

58

1    Q.  BY MR. VOGEL:  Then let's go over to the left
2  side a minute.  It says, "Loss Settlement Provision A1,
3  replacement cost, similar construction."
4      What does that mean and how is it applied?
5    A.  A1 coverage is based on a couple of factors.
6  The first factor is that based on the dwelling amount,
7  if the home is insured to a value of 80 percent or
8  above, A1 coverage is available, which means that we

9   owe a replacement cost to go back with similar
10  construction as it relates to today's construction.
11         In this case, you have a unique home because
12  it's an historical home.  You have a home that's
13  130 years old, thereabout.

                          59

1   Q.  But this has the A1, correct?
2   A.  Correct.

                          76

20         Okay.  391, that page said, "It is the
21  intention of State Farm to handle each claim fairly,
22  promptly, and courteously."
23         Do you agree with that?
24  A.  I agree.
25  Q.  392, they talk about the evaluation of

                          77

1   structural losses and preparing a handwritten or
2   Exactimate estimate, and we've already gone through
3   that?
4   A.  Yes.
5   Q.  It talks about, on 401, "Advance payments in
6   some severe losses, a considerable economic hardship is
7   placed on the insured.  These losses can result from a
8   variety of origins, but generally fire and wind are the
9   most common."
10         Have you had the experience of being able to
11  advance payment to people who have been hit by like a
12  tornado?
13  A.  Yes.

                          92

2   Q.  Okay.  As far as you know, was there just one
3   claims file set up on this case for the tornado?
4   A.  There's just one claim file for the tornado.

                          96

3          We received the report from our insured.  As
4   part of our commitment to our policyholders, one of our
5   standards is is that we want to readily -- any
6   information our policyholder wants to present to us, we
7   want to readily accept that information, review that
8   information with diligence.  We're an advocate for the
9   policyholder.  They have an understanding of the
10  contract, but not a great understanding of the
11  contract.  It's our obligation to know the contract.

                          104

6   Q.  I think I asked you earlier, but you never

7   went to Kansas to investigate the damage to the house
8   or anything; did you?
9      A.  No, I did not.
10     Q.  Did you review the claim documents regarding
11  the tornado claim by Mrs. Swinney?
12     A.  Yes, I did.
13     Q.  Okay.  Did you approve of the way the claim
14  was adjusted?
15     A.  Yes, I did.
16     Q.  Is there anything you would change in the way
17  that it was adjusted?
18     A.  I don't believe so.

GOOD FAITH AND FAIR DEALING AND STATUTORY CLAIMS

28

9      Q.  BY MR. VOGEL:  Have you heard that the duty
10  of good faith and fair dealing is giving the
11  policyholder's interest the same or equal consideration
12  as the insurance company's interest?
13     A.  Yes.
14     Q.  Okay.  And you agree with that?
15     A.  I would agree with that.
16     Q.  I think you said some of these terms, but I
17  just wanted to double check with you.
18        So you agree the insurance company has a duty
19  to thoroughly investigate a claim?
20     A.  Yes.
21     Q.  And they have a duty to timely investigate
22  and evaluate claims?
23     A.  Yes.  That's correct.
24     Q.  Okay.  Do you agree the insurance company
25  should timely pay a claim?

29

1      A.  Yes.
2      Q.  And do you agree denial of a claim should
3   never be based on an inadequate investigation?
4      A.  Yes.

81

16     Q.  Okay.  On page 455, it talks about the Unfair
17  Claims Practices Act.
18        Are you aware that most states in the country
19  have various types of Unfair Claims Practices Acts?
20     A.  Yes.
21     Q.  And have you ever reviewed the Unfair Claims

22  Practices Act for the state of New Mexico?

23      A.  No, I have not.

82

2       Q.  Okay.  And State Farm follows or complies

3  with the Unfair Claims Practices Act, correct?

4       A.  That's correct.